EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, Plaintiff,

v.

WENDY'S OF COLORADO SPRINGS, INC., Defendant.

Civ. A. No. 88–A–2013.

United States District Court, D. Colorado.

Dec. 27, 1989.

Nelson G. Olsten, Robert O. Romero, Joseph W. Simms, Jr., E.E.O.C., Denver, Colo., for plaintiff.

Michael D. Nosler, Rothgerber, Appel, Powers & Johnson, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

ARRAJ, District Judge.

The Equal Employment Opportunity Commission ("EEOC") filed this suit on behalf of one Guy Case ("Case") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) (1982), claiming that Case was denied a demotion and discharged by Wendy's of Colorado Springs, Inc. ("Wendy's") because of his sex. The EEOC seeks Case's reinstatement (with retroactive seniority) to the position from which the Defendant terminated him, back pay with pre-judgment interest, costs and an injunction preventing Wendy's from discriminating on the basis of sex and engaging in any other unlawful employment practices in violation of Title VII.

The parties stipulated that all jurisdictional prerequisites for the filing of this suit have been met and that venue has been properly invoked. The case was tried to the court on November 28–30, 1989. The following shall constitute the court's findings of fact and conclusions of law in conformance with Rule 52(a), Fed.R.Civ.P.

### FACTS

Wendy's of Colorado Springs ("Wendy's") is a licensee of Wendy's International, a licensor of fast-food restaurants. At the time relevant to this litigation, Wendy's was owned by Richard Holland. Holland owned some twenty-three restaurants (stores) in Colorado, Indiana, Ohio and Michigan, and operated some of them through Wendy's. Two of these restaurants were located in Pueblo, Colorado, the "North Store" on Elizabeth Street and the "South Store" on Northern Avenue. It is uncontroverted that these stores do most of their business on weekends and that Saturday is their busiest day.

Wendy's hired Case on January 20, 1985 as a Management Trainee in the North Store. At that time, Case discussed the work in which he would be involved with, among others, Thomas J. Van Horn ("Van Horn"), Wendy's Area Director. From that discussion, Case knew that his work

schedule could change and that Angela Giannetto ("Giannetto") would be his boss.

Case's relationship with Giannetto during the first year was one of conflict. During his first four weeks on the job, he concluded that she was "sarcastic." In October, 1985, Gary Wyberg ("Wyberg"), a Wendy's Supervisor who, at that time, supervised the two stores in Pueblo, decided to transfer Giannetto and Case to the South Store "to give them both a fresh start." He also transferred Lonnie Lentz ("Lentz"), who was then the Assistant Manager at the South Store, to the North Store, where he became Unit Director. Case asked Wyberg if he could remain at the North Store to work with Lentz, but Wyberg refused his request.

Thomas J. Rodenkirch ("Rodenkirch") began working for Wendy's in January, 1986 as Director of Operations. In that capacity, he had responsibility for the day-to-day business operations of all of the restaurants owned by Holland. His immediate subordinate was Van Horn, who was Wendy's Area Supervisor for all the day shifts. Van Horn managed three Supervisors, one of whom was Wyberg.

Each restaurant's Unit Director was responsible for the actions of the Shift Managers. Shift Managers supervised Crew Leaders, who, in turn, directed Crew Members, who cooked and served the food and cleaned the restaurant. Each Shift Manager rotated shifts by working some day shifts followed by some night shifts; after that, each took some days off. Consequently, the schedule of work days and days off for each Shift Manager changed each week.

Rodenkirch believed that this system lacked consistency because Crew Members often worked with different Shift Managers. Therefore, he initiated changes shortly after he began working at Wendy's. Under the new regime, Shift Managers had fixed schedules, so that each Crew Member reported to one Shift Manager. Shift managers became Day or Night Shift Manag-

ers; each reported both to the Unit Director of the restaurant where he worked and to an Area Supervisor responsible for his shift. Meanwhile, Rodenkirch eliminated Assistant, Co-manager and Supervisor positions.[1] It was clear that these changes would necessitate modifications of the work schedule. Therefore, soon after Rodenkirch initiated the changes, Wyberg met with the management of the South Store to explain how they would work.

Giannetto had responsibility for setting the South Store employees' schedules. After meeting with Wyberg, she implemented those modifications. In a meeting attended by Giannetto and Shift Managers Curt Romero ("Romero"), Ann Marie Wodishek ("Wodishek") and Case, it was decided that Wodishek, who had seniority, would become Day Shift Manager. Romero was next in seniority but did not want to be Night Shift Manager, so Case, who had the least seniority, was asked if he wanted the position. Case testified that he agreed to accept the promotion to Night Shift Manager at the South Store on the condition that he could have his weekends free to spend time with his wife, whose job permitted her to take off only Saturday and Sunday. In contrast, Giannetto testified that when Case was promoted, she told him that would try to work out a mutually acceptable schedule of days off but that his having weekends free was not a condition of becoming Night Shift Manager.

In any event, effective January 13, 1986, Wendy's promoted Case to the position of Night Shift Manager at the South Store. George Smith ("Smith") became Wendy's Night Shift Area director.

Giannetto scheduled Case to work weekends for a time. After he complained, she modified the schedule and gave him weekends off. Under the modified schedule, she and Wodishek (both of whom had more seniority than Case) ended up working weekends. In June, 1986, Giannetto reached the conclusion that the schedule should not operate in this way. She in-

1. Thus, Wyberg's position was eliminated. In March, 1986, Wyberg became Unit Director of another Wendy's restaurant.

formed the Shift Managers that she was restoring the old schedule. Case was assigned to work weekends again.[2]

Case found the restoration of the previous schedule unacceptable and asked Giannetto if she would permit him to take off Friday and Saturday as an alternative. She refused. He offered to take off Sunday and Monday instead. She refused this suggestion also. By letter to Giannetto dated June 2, 1986, Case requested a demotion to the position of crew member because he believed that he stood a better chance of getting his weekends off if he held a position of lesser responsibility in the restaurant. Giannetto asked Wodishek if she needed another Crew Member on the day shift, but she did not.

Giannetto did not have the authority ultimately to grant or to deny Case's request, so she gave Case's letter to Smith, who discussed it with Rodenkirch. Smith took the position that people should move forward, not backward, in the company. Subsequently, there were several meetings at which Smith and Giannetto discussed Case's situation. Smith and Giannetto believed that it would not be good for Case or for the restaurant to grant the demotion because it would create internal problems based in part on difficulties Case had experienced in managing his shift.

Smith discussed the situation with Rodenkirch, who had the ultimate authority to terminate managers. Like Smith, he wanted individuals to move forward, not backward, in the organization. On June 16, 1986, under orders from Rodenkirch, Smith terminated Case. He filled out the employee status form indicating that this decision had been made, stating in writing that the reason for the termination was that Case, "[r]efuse [sic] to work necessary time periods necessary [sic] to meet store needs."[3]

Case's work performance at Wendy's was the object of considerable disagreement at trial. Plaintiff presented evidence

that he was a competent employee. He offered a letter of recommendation dated November 11, 1986 (after Case's termination) from Van Horn stating that,

> During his employment with our company, Guy showed good leadership qualities, loyalty, honesty and responsibility capabilities. He learns quickly and has always accepted tasks cheerfully and made sure they were completed in a timely manner. Guy had a good working relationship with his supervisors, co-workers and crew members.

Although she criticized Case for not being "dealing positively" with his crew, Giannetto gave him mostly "average" and "very good" ratings in a March, 1986 evaluation, commenting that "Guy is a strong manager and dose [sic] control his store." Plaintiff also offered evidence that Wendy's relied upon a system of "progressive discipline" in which employees would be sanctioned with increasing severity for defects in performance. As to Case in his role as a Night Shift Manager, however, this system apparently was not used.

Defendant presented evidence that disputed Plaintiff's claims. First, in a form dated July 16, 1985, Van Horn reprimanded Case for, "Failure to call in daily figures." Also, Case testified that Arby's, his previous employer, used a management system that relied more heavily on delegation of duties within the organization. According to Giannetto, Case, accustomed as he was to Arby's management style, would not change his style to conform to Wendy's "hands-on" system in which the manager assisted the crew directly when necessary to meet the demand of heavy volume. Additionally, in a letter dated October 7, 1985, Wyberg criticized Giannetto's management skills. One of the specific tasks he set out for her to accomplish by December 2, 1985 was,

---

**2.** The evidence showed that it was typical for Unit Directors to change the work and days off schedule depending on the needs of the restaurant and fairness to the Shift Managers.

**3.** Smith also marked code number 31 on the form as a reason for termination. Although the

court was not provided with the second page of the form, which explained the code, Smith testified in deposition that it stood for "Refusal to follow instructions, insubordination."

Making or breaking Mr. Case as an assistant, [there] are now no excuses for him or you to make [as] to why he cannot handle the position. I.E.—> ... 1. His responsibilities to unit 2. Money Management 3. Attitude 4. Hussle 5. People skills 6. Excuse laden performance (passing the buck) Etc.

In a letter to Case, also dated October 7, 1985, Wyberg urged him not to "pass[ ] the buck," but, among other things, to be a dependable backup for his co-manager, to develop his "people skills" and to show more initiative. After Wyberg sent these letters, Giannetto counseled Case about what she believed were his managerial deficiencies. Finally, Smith testified that Case's work performance was "[v]ery marginal" and that Case lacked management skills. He testified further that he discussed Case's poor performance with him "several times," although he never reduced his criticisms to writing, and that Case promised to improve but did not do so.

Another point of sharp disagreement between the parties concerned Giannetto's alleged animus against male employees. Plaintiff presented evidence through the deposition of Michael Peattie ("Peattie") that during Giannetto's tenure as Unit Director of the South Store, she treated males differently than females by making them work harder and by criticizing them more strenuously than female employees if their work was not done correctly. Peattie also testified that he had heard Giannetto say that females do better work than the male employees. Deborah Salazar, a Crew Leader at the South Store, testified that she heard Giannetto say that she would like an all-female crew. Finally, Lentz testified that he heard Giannetto say that she was unhappy with certain employees in the South Store and wanted an all-female management team. Giannetto strenuously denied having made such comments.

On June 23, 1986, one week after Case's termination, Wendy's filled the vacancy created by Case's termination as Night Shift Manager of the South Store. To do so, it promoted Janet L. Roybal ("Roybal"), who had been a Management Trainee there and a Crew Member before that.

Plaintiff contended that Giannetto and Roybal were friends and that her promotion was part of Giannetto's plan to create an all-female management team. Defendant demonstrated convincingly, however, that there were important factual weaknesses in Plaintiff's theory concerning Giannetto's alleged plan. Although they had graduated in the same class at Centennial High School, Giannetto and Roybal never were social friends. Moreover, when asked whom she would recommend for the position of Night Shift Manager after Wendy's terminated Case, Giannetto provided the name of Allen Garrison, a male, in addition to offering Roybal's name.[4]

Furthermore, Giannetto did not have the authority to effect the plan alleged by Plaintiff. She did not hire Roybal in the first place, nor did she hire Roybal as a Management Trainee later. Wendy's already employed Roybal at the time it promoted her, and she had performed well when filling in for other Shift Managers. Smith made the decision to hire Roybal, but did so only after she took a test and after she was interviewed twice, once by him and once by Rodenkirch.

Finally, it was Wendy's policy to have people in training to replace people who left unexpectedly. Therefore, it was not unusual for Wendy's to select or hire a person as a Management Trainee before there was a vacancy in management positions. Roybal was not hired initially or promoted subsequently to the position of Management Trainee to replace Case.

## ANALYSIS

Plaintiff EEOC has alleged disparate treatment of Guy Case in violation of Title VII of the Civil Rights Act of 1964. Title VII provides, in pertinent part, that:

It shall be an unlawful employment practice for an employer—

---

4. Garrison was not working at Wendy's at that time, although he had worked with Giannetto at another Wendy's restaurant between October, 1984 and October, 1985.

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

## I.

In applying the Title VII statute, the courts differentiate between "direct evidence" and "indirect evidence" cases. Direct evidence cases are those in which the plaintiff attempts to prove disparate treatment by use of evidence which, "if believed, resolves a matter in issue." *McCormick on Evidence* 543 (E. Cleary 3d ed. 1984). As a commentator noted recently,

An obvious example of direct evidence is a statement by a supervisor that the employer "doesn't promote women." Other examples include facially discriminatory policies, such as special rules for maternity leave, *see, e.g., Maddox v. Grandview Care Center, Inc.,* 607 F. Supp. 1404 (M.D.Ga.1985), *aff'd,* 780 F.2d 987 ([11th Cir.] 1986), or rules expressly disfavoring a group based on its protected characteristic, *see, e.g., Trans World Airlines v. Thurston,* 469 U.S. 111 [105 S.Ct. 613, 83 L.Ed.2d 523] (1985) (mandatory retirement age for cockpit employees). If that evidence is believed, the court need make no further inference to conclude that the employer intentionally discriminated. Unlike the "doesn't-promote-women" example, however, most direct evidence is not *conclusive,* in the sense of not requiring any further support. Direct evidence need not *prove* the matter in issue, but only must speak directly to it. *See* R. Lempert & S. Saltz-

burg, [*A Modern Approach to Evidence* 151 (2d ed. 1983) ].

Note, *Clearing the Mixed–Motive Smokescreen: An Approach to Disparate Treatment Under Title VII,* 87 Mich.L.Rev. 863, 865 n. 11 (1989) (emphasis in original). *See* M. Player, *Employment Discrimination Law* § 5.40(b), at 327–28 (1988). It follows, then, that "indirect evidence" cases are those in which the plaintiff attempts to prove discrimination through evidence that requires additional inferences to prove that discrimination occurred. M. Player, *supra,* § 5.40(c), at 328–29.

The purpose of differentiating between direct and indirect evidence cases is to aid plaintiffs who genuinely are discriminated against but lack direct evidence to prove it. In *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977), the Court explained that under such circumstances, a plaintiff is required to "demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *Id.* The plaintiff's implicit ruling-out of these two reasons "is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." *Id.*

■ This is not a direct evidence case. Plaintiff has argued that statements allegedly made by Giannetto concerning her view that women were better workers than men and her desire to have an all-female management team at the South Store were direct evidence of discrimination by the defendant. Direct evidence would lead the court to make an inference of discrimination. For Plaintiff to demonstrate discrimination in this way, however, it would have to show a link between Giannetto's intent to form an all-female management team and Case's termination. In fact, Giannetto had no authority to deny Case's offer of a demotion or fire him, so that evidence does not support directly the inference that Case was terminated because of his sex. Therefore, it is not direct evidence.

The cases Plaintiff cited in its trial brief to support use of the direct evidence framework are inapplicable here. In *Trans World Airlines v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), plaintiff presented direct evidence in the form of TWA's transfer policy and challenged it on grounds of age discrimination in violation of the Age Discrimination and Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* The policy permitted captains displaced for reasons other than age to take positions as senior flight engineers by "bumping" less senior flight engineers, but did not permit captains older than sixty to do so automatically. Similarly, in *EEOC v. Wyoming Retirement System*, 771 F.2d 1425 (10th Cir. 1985), plaintiffs offered a Wyoming retirement statute as direct evidence of discrimination in violation of the ADEA. Likewise, in *Ramirez v. Sloss*, 615 F.2d 163 (5th Cir.1980), plaintiff alleged discrimination based upon resident alien status in violation of 42 U.S.C. §§ 1981, 1983 and 1985. Plaintiff presented as direct evidence a provision of city's personnel manual expressing an employment preference for United States citizens.[5] The trial court applied the test of *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and the Fifth Circuit reversed:

> In the rare situation in which the evidence establishes that an employer openly discriminates against an individual it is not necessary to apply the mechanical formula of *McDonnell Douglas* to establish an inference of intentional discrimination; the showing has already been made directly.

*Ramirez, supra,* 615 F.2d at 168 (footnote omitted). This case is not *Ramirez,* but rather the more typical case in which the evidence does not establish that an employer openly discriminates against an individual. Unlike plaintiffs in *Thurston, Wyoming Retirement System* and *Ramirez,* Plaintiff in this action did not present evidence of Defendant's application of rules that expressly disfavored a group based on its protected characteristic.

Plaintiff also relies upon cases in which those responsible for making employment decisions made comments suggesting discriminatory intent or motive concerning those decisions. *Lee v. Russell County Bd. of Ed.,* 684 F.2d 769 (11th Cir.1982), was a civil rights suit brought under 42 U.S.C. § 1983 for alleged racial discrimination in the decision not to reemploy several black teachers. The court analyzed the issue under Title VII framework. In *Lee,* plaintiff testified that a school board member made several comments indicating his desire to have a greater white presence in the ranks of junior high school teachers. In discussing direct evidence cases, the court stated that, "Where the evidence for a prima facie case consists, as it does here, of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the prima facie evidence the ultimate issue of discrimination is proved; no inference is required." *Id.* at 774 (footnote omitted). Similarly, in *Buckley v. Hosp. Corp. of America, Inc.,* 758 F.2d 1525 (11th Cir.1985), Plaintiff, a nurse, was allegedly fired because of her age and challenged the firing under the ADEA. The Eleventh Circuit found that statements and actions by Thompson, the administrator at the hospital where Plaintiff worked, constituted direct evidence of age discrimination:

> The significant evidence includes Thompson's expression of surprise at the longevity of the staff members, his indications that the hospital needed "new blood" and that he intended to recruit younger doctors and nurses, and his comment on plaintiff's "advanced age" causing her stress at the time of [an argument between the plaintiff and a coworker]. In addition, in his investigation of th[at] ... incident, Thompson failed to interview three employees who witnessed the event and who subsequently testified in favor of plaintiff, although the names of these employees were known to Thompson at the time of his investiga-

---

5. Title VII does not apply to employment discrimination on basis of alienage. 42 U.S.C. § 2000e-2(a); *Espinoza v. Farah Mfg. Co., Inc.,*

414 U.S. 86, 88–89, 94 S.Ct. 334, 336–37, 38 L.Ed.2d 287 (1973).

tion. Finally, it is worth noting that, although most of plaintiff's replacements were not outside the protected class, the two individuals who ultimately absorbed the bulk of her duties were more than 15 years her junior.

*Id.* at 1530 (footnote omitted). Finally, in *Bell v. Birmingham Linen Svc.*, 715 F.2d 1552 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984), plaintiff alleged that defendant declined to promote her or constructively demoted her because she was a woman. The court stated that, "The district court in this case specifically accepted as credible testimony indicating that [defendant's] decision-maker, Gus Westbrook, stated that he would not allow Bell into the washroom because if she were allowed in, all women would want to enter. This testimony is 'highly probative evidence' of illegal discrimination." *Id.* at 1557 (footnote and citations omitted). In *Lee*, the school board member who allegedly made comments concerning the racial makeup of school teachers had authority to re-employ those teachers. In *Buckley*, the administrator who allegedly made the remarks concerning the age of his staff was in a position to fire the plaintiff. In *Bell*, the Defendant's decision-maker was in a position to promote Plaintiff. In contrast to evidence presented in *Lee, Buckley* and *Bell*, the evidence presented by Plaintiff here that purported to be "direct evidence" consisted of Giannetto's statements, and Giannetto was not in a position to make the employment decisions by which Case is aggrieved.

"[I]f the factfinder does not credit the plaintiff's direct evidence of discrimination, the *McDonnell Douglas* mode of analysis still applies." *Long v. Laramie County Community College Dist.*, 840 F.2d 743, 749 (10th Cir.1988) (citation omitted). The court is not persuaded that Plaintiff has made a direct showing of discrimination in this case. Therefore, the court rejects its

suggestion that the direct evidence framework should be used.[6]

## II.

■ The case at bar is an indirect evidence case of disparate treatment on the basis of sex. The Supreme Court has held that Title VII protects people aggrieved because of so-called "reverse discrimination," in which an employer discriminates against a member of a historically favored group. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976). Males are a historically favored group, and Title VII analysis applies to allegations of discrimination against men. *Livingston v. Roadway Express, Inc.*, 802 F.2d 1250, 1252 (10th Cir.1986).

The ultimate question in a disparate treatment case is whether the defendant intentionally discriminated against the complainant employee. *United States Postal Svc. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). More specifically, the issue is whether "the employer is treating 'some people less favorably than others because of their race, color, religion, *sex* or national origin.'" *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), *quoting Teamsters, supra*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15 (emphasis added). In demonstrating this, Title VII plaintiffs always bear the ultimate burden of persuasion. *Burdine, supra*, at 450 U.S. at 253, 256, 101 S.Ct. at 1093, 1095. *See also Curry v. Oklahoma Gas & Elec. Co.*, 730 F.2d 598, 602 (10th Cir.1984).

There are three stages of Title VII analysis. Initially, Title VII plaintiffs carry the burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Burdine, supra*, 450 U.S. at

---

6. Plaintiff also cites *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), in support of its position. *Mt. Healthy* applies to so-called mixed motive cases. This is not a mixed motive case

because Defendant has not conceded that the issue of Case's sex entered into the decision to terminate. Plaintiff's case is built entirely on the theory of pretext.

252–253, 101 S.Ct. at 1093; *McDonnell Douglas, supra*, 411 U.S. at 802, 93 S.Ct. at 1824. "As the Court explained in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 [98 S.Ct. 2943, 2949, 57 L.Ed.2d 957] (1978)[ ], the *prima facie* case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine, supra*, 450 U.S. at 254, 101 S.Ct. at 1094.

The court reaches the second stage of analysis if plaintiff establishes a *prima facie* case. In that event, the burden of production shifts to the defendant, which "need only 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 802, 93 S.Ct. at 1824, *quoted in Ray v. Safeway Stores, Inc.*, 614 F.2d 729, 731 (10th Cir.1980). *See Furnco, supra*, 438 U.S. at 578, 98 S.Ct. at 2950. "If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Burdine, supra*, 450 U.S. at 254, 101 S.Ct. at 1094 (footnote omitted). As Court has noted:

> Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Id.* at 255–56, 101 S.Ct. at 1095.

The court reaches the third stage of analysis if the defendant meets its burden of production. At that point, the inference of discrimination falls away and the factfinder must weigh the evidence to determine if impermissible discrimination occurred. *Id.* at 256, 101 S.Ct. at 1095. As the Court has stated:

> This burden now merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Id.* at 256, 101 S.Ct. at 1095, *citing McDonnell Douglas, supra*, 411 U.S. at 804–05, 93 S.Ct. at 1825.

### III.

In an indirect evidence case, the plaintiff may establish a prima facie case of discrimination by showing

> (i) that [the complainant] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas, supra*, 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). The Court enunciated the *McDonnell Douglas* test in a case concerning racial discrimination in the decision not to hire. The Court has noted that the test was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco, supra*, 438 U.S. at 577, 98 S.Ct. at 2949. The specific elements which must be proven depend upon the nature of the challenged employment decision. *Brown v. Parker–Hannifin Corp.*, 746 F.2d 1407, 1409 (10th Cir.1984), *citing McDonnell Douglas, supra*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.

■ In a reverse discrimination case where an employee was terminated allegedly because he was male, this court believes that the first three elements of the

test of the *McDonnell Douglas prima facie* case must be modified. *Ray, supra,* 614 F.2d at 730. First of all, Plaintiff must belong to a protected group. In addition, the D.C. Circuit noted in *Parker v. Baltimore & O.R. Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981), that,

> Membership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated, for only in that context can it be stated as a general rule that the "light of common experience" would lead a factfinder to infer discriminatory motive from the unexplained hiring of an outsider rather than a group member. Whites are also a protected group under Title VII, but it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present situation.

The court explained that, "evidence of a racially discriminatory environment served as a functional equivalent of the first *McDonnell Douglas* criterion, membership in a racial minority." *Parker, supra,* at 1018. Recently, Judge Matsch of this court discussed this reasoning in a case involving alleged racial discrimination against a white employee:

> The traditional criteria for evaluating a prima facie case under Title VII, suggested in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is not applicable because the plaintiff is not a member of a "protected minority." As a result of historical experience in this country, the law recognizes that an inference of discrimination arises when a qualified applicant, who is a member of a minority group, is rejected in favor of a white person. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). There is no similar historical basis for presuming discrimination against white people. Therefore, no inference of discrimination arises when a black employee is selected over a white employee. *Parker v. Baltimore & O.R. Co.,* 652 F.2d 1012 (D.C.Cir.1981). White workers are, however, protected from racial discrimination in employment under Title VII and 42 U.S.C. § 1981, *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

*Cunico v. Pueblo School Dist. No. 60,* 693 F.Supp. 954, 956–57 (D.Colo.1988). The Tenth Circuit has also discussed this rationale in a disparate impact case. *Livingston v. Roadway Express, Inc.,* 802 F.2d 1250, 1252 (10th Cir.1986) was a case of alleged reverse sex discrimination in which plaintiff challenged a height restriction as discriminatory against men:

> When a plaintiff who is a member of a [historically] favored group alleges *disparate treatment,* the courts have adjusted the prima facie case to reflect this specific context by requiring a showing of "background circumstances [which] support the suspicion that the defendant is that unusual employer who discriminates against the majority.

(emphasis added), *quoting Parker, supra,* 652 F.2d at 1017. In *Livingston,* albeit in *dicta,* the Tenth Circuit appeared to adopt the *Parker* rationale as to disparate treatment cases.

Second, the plaintiff must show that the aggrieved employee was qualified for the job from which he was discharged. *Ray, supra,* 614 F.2d at 730 (footnote omitted), *citing McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. Third, the plaintiff must demonstrate that the employee was terminated despite his qualifications. *Id.*

Fourth, as in *McDonnell Douglas,* the plaintiff must show that after the employee's termination, the employee's job remained available. *Id.* Alternatively, the plaintiff may satisfy the fourth prong of the *McDonnell Douglas* test by demonstrating that someone was hired in his place after he was fired. *Brown, supra,* 746 F.2d at 1409–10 (footnote omitted); *Crawford v. Northeastern Oklahoma State Univ.,* 713 F.2d 586, 588 (10th Cir. 1983); *Mohammed v. Callaway,* 698 F.2d 395, 398 (10th Cir.1983).

## IV.

■ As the Supreme Court held in *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093, the burden of proving a *prima facie* case of impermissible discrimination is not onerous. In applying the Title VII legal framework to the facts at bar, the court finds that Plaintiff has demonstrated a *prima facie* case of discrimination by Wendy's against Guy Case by a preponderance of the evidence. Case is male, and males are a protected group under Title VII. *Livingston, supra,* 802 F.2d at 1252. Further, Plaintiff elicited statements to the effect that as Unit Director Giannetto treated male employees differently than she did female employees. Therefore, even assuming the applicability of the *dicta* in *Livingston* that would require plaintiff to adduce proof of background circumstances suggesting that Wendy's is the unusual employer that discriminates against men, *id.,* Plaintiff here has met its burden.

Second, Plaintiff demonstrated that Case was qualified for the position of Night Shift Manager. In March, 1986, Giannetto gave him primarily "average" and "very good" ratings in a performance evaluation, calling him a "strong manager." In addition, Van Horn wrote a letter several months after Case's termination complementing his performance as a manager at Wendy's. Finally, Case's work performance was not raised as an issue at the time of his termination.

Third, Plaintiff showed that on June 16, 1986, Wendy's terminated him despite his qualifications.

Finally, Plaintiff demonstrated that the position from which he was terminated remained open. Wendy's promoted Roybal, a female, to the position of Night Shift Manager effective June 23, 1986. She took the position vacated by Case. In this case, then, Plaintiff has satisfied the fourth prong of the *McDonnell Douglas* test by either of the methods of proof approved by the Tenth Circuit.

Because Plaintiff made out a *prima facie* case of reverse sex discrimination, the burden of production shifted to Defendant. To sustain its burden, Defendant had to "articulate some legitimate, nondiscriminatory reason" for the employee's termination. *McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. *See Furnco, supra,* 438 U.S. at 578, 98 S.Ct. at 2950. The reason for terminating Case that Defendant articulated was that he, "[r]efuse [sic] to work necessary time periods necessary [sic] to meet store needs." Refusal to work the time periods necessary to meet the demands of business demonstrates a lack of qualification for the position of Night Shift Manager. Lack of qualifications is a legitimate, nondiscriminatory reason for terminating an employee. *See Teamsters, supra,* 431 U.S. at 358 n. 44, 97 S.Ct. at 1866 n. 44.

Since Wendy's has articulated a legitimate, nondiscriminatory motive for Case's termination, the inference of discrimination that arose as a result of Plaintiff's *prima facie* case falls away. The crucial issue in this case is whether, in refusing to accept his offer of a demotion and then terminating him, Wendy's discriminated against Guy Case because he was male. *See Aikens, supra,* 460 U.S. at 715, 103 S.Ct. at 1481; *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093.

One of the linchpins in Plaintiff's case consists of statements made by Giannetto indicating that she wanted an all-female management team at the South Store and that women performed better than men. Absent more, these statements are not enough to justify a finding of sex discrimination. To prove that, Plaintiff had to demonstrate that this animus was the reason Wendy's terminated Case. This it has failed to do.

Giannetto did not have the authority to reject Case's offer of a demotion or to fire him. Although Giannetto had input into the discussions about Case's situation, Smith, with Rodenkirch's approval, made the decision not to accept Case's offer of a demotion and to terminate Case. He also filled out the termination form. At the time Wendy's terminated Case, those who did have authority in these matters did not share her allegedly discriminatory animus. Wendy's upper management simply was

not pleased with his work performance. When Case began working at Wendy's, he had recently finished working for a fast-food restaurant that encouraged its managers to delegate tasks to their subordinates. Wendy's expected him to work with the crew he was supervising, but he did not do so.

Additionally, Wendy's expected Case to work weekends, the restaurant's busiest time. Case wanted to work for Wendy's, but he did not want to work during the times when it needed its Shift Managers the most. Case offered to give up one weekend day if he could take off the other, but he was the Shift Manager with the least seniority at the South Store and others had priority over him in taking those days off.

Finally, Wendy's expected Case to move forward in its management ranks. The company had invested resources in Case's training. Case wanted to take a position of lesser responsibility so that he could spend more time with his wife. As difficult as balancing work and family may be, however, the court concludes that Wendy's had a legitimate business interest in avoiding the disruption it believed would occur if a former manager took a position where his peers would be Crew Members whom he had once supervised. For these reasons, Wendy's decided to cut its losses by denying him a demotion and terminating him. I conclude that its rationale was not a pretext.

Wendy's did hire Roybal, a woman, to fill Case's position, which resulted in the formation of an all-female management team at the South Store. Although Giannetto recommended Roybal for the position, she also recommended a male who had had experience with Wendy's. She had no power either to hire Roybal initially or to promote her later to management. In its management ranks, Defendant's uncontroverted evidence demonstrated that 49.9% were male; 50.1% were female. The fact that the South Store ended up with an all female management team is not, without more, sufficient evidence to prove sexual discrimination against Case. Finally, given

the number of stores in its orbit and the turnover that it was experiencing at the time, it was not unusual for Wendy's to promote employees to management positions even before there were openings for them. The hiring of Roybal was not the final step in a plan to create an all-female management team at the South Store.

Wendy's might not have followed properly its own policies in disciplining Case for poor work performance. When dealing with him, perhaps Wendy's managers should have employed the "progressive discipline" they generally used. Unfortunate as that may be, it is relevant in a case of alleged reverse sex discrimination only insofar as it indicates that the reasons why Wendy's terminated Case were pretextual. I conclude that they were not.

This is a case in which an employer terminated an employee who did not fit into the structure of its business. It is not a case in which Defendant either denied Guy Case a demotion or terminated him because he was male.

## V.

█ The Defendant has requested attorney's fees. Title VII permits the court to award attorney's fees to prevailing parties other than the EEOC and the government. 42 U.S.C. § 2000e–5(k) (1982). The Tenth Circuit has stated that under the statute

"[A] plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 [1978]. The provision in section 2000e–5(k) for the award of attorney's fees to the prevailing party discourages filing frivolous or unreasonable suits by making the unreasonable plaintiff liable for defendant's fees. At the same time it encourages plaintiffs who have a bona fide cause of action to proceed by providing for an award of reasonable attorney's fees to a plaintiff should he prevail.

*Smith v. Josten's American Yearbook,* 624 F.2d 125, 126 (10th Cir.1980). Plaintiff here presented a *prima facie* case. Therefore, Plaintiff's claim was neither frivolous, unreasonable, or groundless; I decline to award attorney's fees to the Defendant under 42 U.S.C. § 2000e–5(k). *Cf. Gordon v. Hercules, Inc.,* 715 F.Supp. 1033, 1033–34 (D.Kan.1989) (denial of attorney's fees to prevailing defendant even where plaintiff failed to meet its burden of proving a *prima facie* case).

## CONCLUSION

I conclude that the EEOC has failed to establish by a preponderance of the evidence that Wendy's violated Title VII by subjecting Guy Case to disparate treatment because he was a male. Therefore, Plaintiff is not entitled to the relief it seeks. Defendant is not entitled to attorney's fees.

Accordingly,

IT IS ORDERED that the Clerk shall enter final judgment in favor of the Defendant and against the Plaintiff.

IT IS FURTHER ORDERED that each party is to pay its own costs.