Karl PARKER, Jr., Appellant,

v.

The BALTIMORE AND OHIO RAIL-ROAD COMPANY t/a The Chessie System—The B & O Railroad, Appellee.

No. 80–1095.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 9, 1981.

Decided April 16, 1981.

---

Robert L. Cohn, Washington, D.C., was on the brief for appellant.

Morgan D. Hodgson with whom Peter L. Wellington, Washington, D.C., was on the brief for appellee.

Before BAZELON, Senior Circuit Judge, and TAMM and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Opinion filed by Circuit Judge TAMM, concurring in the result.

MIKVA, Circuit Judge:

The overt and blatant bigotry that marked the leading civil rights cases of an earlier year seldom supplies the gravamen of cases which now reach the appellate courts. Rather, the appeals are from decisions involving the more difficult problems in this field, none more difficult than the delicate balance of interests necessary in adjudicating the claims of "reverse" discrimination that sometimes accompany an employer's efforts to improve the record of his hiring practices. This case presents such claims, but in a form as yet ill-suited for final determination.

Karl Parker, Jr. (Parker), a white male, has been employed as a conductor and trainman on the Baltimore & Ohio Railroad (B&O) since 1974. From 1975 to 1978, he actively sought transfer or promotion (the hierarchical relationship is unclear) to the job of locomotive fireman. To date, the only fruit of his efforts is the present lawsuit, charging B&O with race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1976). Parker appeals from an order of the district court, granting summary judgment for B&O, denying him leave to amend, and dismissing his complaint. Finding the district court's actions unduly precipitous, we reverse and remand for further proceedings.

## I. THE PROCEEDINGS BELOW

Parker filed his original complaint in January 1979. It alleged discriminatory acts in 1976, 1977, and 1978, on bases of race, gender, national origin, and religion; its theory was essentially that affirmative action constituted unlawful reverse discrimination. Discovery proceeded through the spring. On June 27, 1979, the Supreme Court decided *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), holding that affirmative action programs do not necessarily violate Title VII. Parker's counsel was permitted to withdraw on July 30, and on September 14 new counsel sought to file an amended and supplemental complaint.

This new complaint continued to deny the lawfulness of B&O's affirmative action, urging that B&O had gone beyond the bounds suggested by the Supreme Court in *Weber*. It also added claims under 42 U.S.C. § 1981 (1976) and charged that B&O had retaliated against Parker for his opposition to discriminatory employment practices, a protected activity under Title VII. The complaint was accompanied by arguments and exhibits in opposition to a pending motion for summary judgment in favor of B&O.

On December 13, 1979, in an order terse enough to be quoted here in its entirety, the district court denied leave to file the amended complaint, and granted summary judgment. The court stated its reasons as follows:

### ORDER

Upon consideration of plaintiff's motion for leave to file an amended and

supplemental complaint, defendant's opposition thereto, defendant's motion for summary judgment, and plaintiff's opposition thereto, it appearing that plaintiff has alleged in his original complaint that defendant has subjected him to reverse-racial employment discrimination, and it further appearing that the proffered amended and supplemental complaint does not substantially alter the nature of plaintiff's original cause of action, and it further appearing that the operative facts of the above-captioned case are substantially the same as those in *United Steelworkers of America, AFL–CIO v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), wherein the Supreme Court held that voluntary affirmative action plans granting preference to black employees over white employees with more experience [were] not violative of 42 U.S.C. § 2000e et seq., and it further appearing that defendant's actions did not require plaintiff's discharge, did not permanently bar plaintiff's possible employment advancement, and did not constitute an intentional maintenance of racial balance, and it further appearing that plaintiff has not raised any genuine issues of material facts, it is this 13th day of December, 1979,

ORDERED That plaintiff's motion for leave to file amended and supplemental complaint be and it is hereby denied, and it is further

ORDERED That defendant's motion for summary judgment be and it is hereby granted, and it is further

ORDERED That the complaint in the above-captioned case be and it is hereby dismissed.

*Parker v. Baltimore & Ohio Railroad Co.*, Civ.No. 79–158 (D.D.C. Dec. 13, 1979). Parker appeals from this order of the district court.

## II. SUMMARY JUDGMENT AND THE APPLICABILITY OF *WEBER*

In *United Steelworkers v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61

L.Ed.2d 480 (1979), the Supreme Court observed that it was not "defin[ing] in detail the line of demarcation between permissible and impermissible affirmative action plans." The Court distinguished, but did not overrule, *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), in which a unanimous court had affirmed that Title VII extends its protections to white workers as well as black. The Court has thus made clear that recitation of a benign purpose for disparate treatment based on race will not necessarily immunize a private employer from liability to the disadvantaged class of employees.

In the present case, the district court found that B&O's actions did not require Parker's discharge, did not permanently bar his possible employment advancement, and did not constitute an intentional maintenance of racial balance. These features had also characterized the affirmative action plan upheld in *Weber*, and had entered into the Court's conclusion that "the plan does not unnecessarily trammel the interests of the white employees." 443 U.S. at 208, 99 S.Ct. at 2730. The district court apparently accepted B&O's argument that such findings always compel the conclusion that the rights of white workers are not unduly trammeled. We do not believe that *Weber* supports the proposition that no purported affirmative action plan is ever unlawful unless it requires discharge, permanently bars advancement, or maintains racial balance, and, as we explain below, we find that the record simply does not contain enough information to demonstrate whether B&O's policies unnecessarily trammel the interests of white employees. We therefore conclude that a crucial fact remained disputed, and that summary judgment was premature.

### A. *B&O's Hiring Decisions*

Parker claims that his efforts to become a locomotive fireman were defeated by illegal preferences given to black and female applicants.[1] B&O agrees that in 1976 the six

---

1. Parker has abandoned his claims of discriminatory preferences to persons of favored national origin or religion.

fireman openings were filled by two white men, one white woman, two black men, and one black woman. In 1977, all nine positions went to white men. In 1978, eight positions went to white men, and a ninth job was taken by a black man. Thus, 1976 and 1978 are the periods in dispute for Parker's claims of race and gender discrimination.[2]

B&O relies on an affidavit acknowledging that the company "has engaged in affirmative action . . . . to overcome the underutilization of minorities and women in various jobs," and that this action "has included using race and sex as factors in the selection of some applicants in December 1976 for transfer to locomotive fireman positions." Affidavit of Robert E. Upton, Ass't to the Senior Vice President, [hereinafter cited as Upton Affidavit], Joint Appendix (J.A.) at 96–97. In particular, the record contains evidence of "Seniority Modification Agreements" between B&O and unions representing its employees, permitting preferential transfer without loss of seniority by eligible minority and female employees.[3] The agreement apparently governing the decisions in this case was signed on November 6, 1975 by B&O's multiemployer bargaining representative and the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees (BRAC).

The record indicates that eligibility for transfer under the BRAC agreement was limited to workers continuously employed by B&O since August 31, 1971. No copy of any Seniority Modification Agreement itself, however, appears in the record. In fact, it was Parker who introduced the only document that sheds light on the theoretical workings of this aspect of B&O's affirma-

tive action efforts, an "Explanation of Rights of Minority and Female Employees under Seniority Modification Agreements" addressed to B&O employees. Exhibit 1 to Plaintiff's Memorandum of Points and Authorities, J.A. 154–58.[4] In arguing its entitlement to summary judgment, B&O points to no further details concerning its methods of considering race and sex as factors in hiring decisions, except by its assertion that "[o]ther than in connection with B&O's affirmative action, race and sex have not been used as factors in the selection of applicants for positions at B&O." Upton Affidavit, J.A. 97.

It appears from the record that the two black workers who transferred to the position of locomotive fireman in 1976 were eligible for preference under the BRAC agreements, but that the two women had joined the company after the eligibility date.[5] Counsel for B&O suggested at oral argument that the time limit for eligibility had been "waived" for their benefit. The black locomotive fireman who was hired in 1978 was not previously a B&O employee at all, but had been referred by the Maryland State Employment Service.[6] These facts suggest that the lawfulness of B&O's actions could not be judged entirely from the face of the Seniority Modification Agreements, even if those agreements were in the record.

B. *Applicability of* Weber *to B&O's 1976 Decisions*

In *Weber*, the employee challenged on its face an affirmative action plan of mathematical simplicity. Craft trainees were chosen on the basis of seniority from the plant's production workers, subject to the limitation that at most fifty percent of the

---

**2.** B&O raises various procedural objections to Parker's charges of discrimination in 1978, but the district court never addressed them. They remain open to consideration on remand.

**3.** *See* B&O Answers to Plaintiff's Interrogatories at 3, J.A. 34.

**4.** Parker introduced this document as evidence of B&O's intentional use of race and gender as factors in hiring. Subsequently, B&O submitted a copy of the same document, in the

belief that Parker had inadvertently omitted some pages. *See* Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Leave to File Amended and *Supplemental Complaint* at 22 n.34, J.A. 222 n.34.

**5.** *See* B&O Answers to Plaintiff's Interrogatories at 15, 18, J.A. 46, 49.

**6.** *See* Exhibit 3 to Plaintiff's Memorandum of Points and Authorities, J.A. 163.

new trainees were to be white. 443 U.S. at 199, 99 S.Ct. at 2725. The training program was itself created as an affirmative action effort, and the selection process did not abrogate pre-existing seniority rights. *Id.* at 199, 99 S.Ct. at 2725; *Id.* at 215, 99 S.Ct. at 2734 (Blackmun, J., concurring). The Court noted that the craft admission plan was a temporary measure, effective only until the percentage of black skilled craft workers in the plant approximated the percentage of blacks in the local labor force. *Id.* at 208–09, 99 S.Ct. at 2730–2731; *but see id.* at 223 n.3, 99 S.Ct. at 2738 n.3 (Rehnquist, J., dissenting) (disputing this finding).

The relative clarity of the facts in *Weber* contrasts starkly with the obscurity of the present record. Initially, B&O relied on self-serving conclusory statements in the Upton Affidavit, assuring the court that it never considered race and gender as factors except in the context of its efforts to overcome underutilization. Next, B&O defended the Seniority Modification Agreements, which, the record indicates, were strictly applicable to only two of the challenged hirings. B&O has provided no information concerning affirmative action policies, if any, for employees not covered by the agreements; we note that the BRAC agreement was designed to expire at the end of 1976,[7] and presumably does not govern B&O's current employment policy.

Self-serving statements for purposes of litigation do not automatically validate a purported affirmative action program. The Supreme Court's *Weber* opinion strongly suggests that an affirmative action plan can be so invasive of the interests of majority workers that it violates Title VII. We do not believe that the only impermissible actions against employees' interests are discharging them and permanently barring their advancement. Since the record in this case does not sufficiently illuminate B&O's practices to enable a court to decide whether they "unnecessarily trammel the inter-

ests of the white employees," a genuine issue of material fact remained unresolved, and summary judgment was premature.

### C. *The 1978 Hiring Decision and the Prima Facie Case*

In granting summary judgment, the district court did not distinguish between claims regarding 1976 hiring decisions and the claim involving 1978. Apparently the court was convinced by B&O's affidavits that, if race was used as a factor in 1978, then that use was part of a permissible affirmative action program. The court's ruling on the 1978 claim must be reexamined when more information is available concerning B&O's affirmative action efforts. We observe, however, that Parker has not yet demonstrated that race *was* a factor in the 1978 hiring—although B&O conceded its deliberate use of race and gender under the rubric of affirmative action in 1976, the record reflects no such concession concerning 1978. It will therefore be necessary on remand for Parker to adduce evidence of an intent to discriminate. This court has recently clarified the standards for establishment of a prima facie case of discriminatory promotion in Title VII suits brought by white employees, *see Daye v. Harris*, No. 79–2371 (D.C. Cir. Jan. 15, 1981), and Parker may avail himself of these standards in proving racial motivation.

The Supreme Court held that racially discriminatory intent could be inferred from circumstantial evidence in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and the standard enunciated in that case remains the cornerstone of evidentiary analysis in disparate treatment cases under Title VII. The Court held that for a black job applicant to establish a prima facie case without direct evidence of discriminatory motive, it is enough to show

(i) that he belongs to a racial minority;
(ii) that he applied and was qualified for a job for which the employer was seeking

---

**7.** An employee's opportunity to take advantage of the BRAC agreement ended 180 days after his receipt of the explanatory notice dated April 29, 1976. *See* Exhibit 1 to Plaintiff's Memorandum of Points and Authorities, J.A. 157.

applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted).

The *McDonnell Douglas* test is not an arbitrary lightening of the plaintiff's burden, but rather a procedural embodiment of the recognition that our nation has not yet freed itself from a legacy of hostile discrimination. The Supreme Court has explained this standard as

> a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.

*Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).[8]

The Court recognized in *McDonnell Douglas* that modifications in the standard would be required to adapt it from the context of a discriminatory refusal to hire to other employment situations. This court has recently stated a version of the *McDonnell Douglas* test for discrimination in competitive promotion decisions. The first three elements are the same, while the fourth is replaced by the requirement that "other employees of similar qualifications who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied." *Bundy v. Jackson*, 641 F.2d 934 at 951 (D.C.Cir.1981).

Before this test can be applied to Parker's claim, however, a further adjustment must be made. The original *McDonnell Douglas* standard required the plaintiff to show "that he belongs to a racial minority." Membership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated, for only in that context can it be stated as a general rule that the "light of common experience" would lead a factfinder to infer discriminatory motive from the unexplained hiring of an outsider rather than a group member. Whites are also a protected group under Title VII, but it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society.

This court has allowed majority plaintiffs to rely on the *McDonnell Douglas* criteria to prove a prima facie case of intentionally disparate treatment when background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.[9] In *Daye v. Harris*, No. 79–2371 (D.C.Cir. Jan. 15, 1981), the court analyzed a contested promotion within the nursing staff at St. Elizabeth's Hospital. A majority of the nurses at St. Elizabeth's were black, and they received an overwhelmingly large proportion of the promotions.[10] Practices inconsistent with the usual procedure at St. Elizabeth's focused further suspicion on this particular choice, which the plaintiff claimed to be the result of a conspiracy between the retiring chief nurse, who was white, and the division medical director, who was black. Under these circumstances, the court held that the plaintiff was enti-

---

**8.** When the employer articulates a legitimate, nondiscriminatory reason for his decision, the burden remains on the plaintiff to show that the actual reason was more likely than not the racial one. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**9.** We do not equate lawful affirmative action with discrimination against the majority, nor do we suggest that a lawful affirmative action

program would in itself constitute suspicious circumstances sufficient to justify an inference of discriminatory intent under *McDonnell Douglas*.

**10.** Between January 1975 and July 1976, 92% of the promotions in the division went to the black nurses, although 32% of the nurses were white. *Daye v. Harris*, slip op. at 5 n.8.

tled to use the *McDonnell Douglas* standard for the prima facie case, and that she was not required to provide direct evidence that the irregular acts of favoritism toward the successful candidate were motivated by her race rather than other factors. Thus, evidence of a racially discriminatory environment served as a functional equivalent of the first *McDonnell Douglas* criterion, membership in a racial minority.

Parker's claims of unlawful discrimination in 1976 will be subjected to further inquiry by the district court on remand. If the court finds that evidence of B&O's unlawful consideration of race as a factor in hiring in the past justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely, Parker should not be required to adduce direct evidence that race was a factor in the 1978 hiring decision. If Parker's qualifications enable him to meet the other criteria of *McDonnell Douglas*, the burden of going forward would then shift to B&O to articulate a legitimate nondiscriminatory reason for its actions in 1978, in accordance with the usual *McDonnell Douglas* analysis.

## III. THE AMENDED COMPLAINT

In the order granting summary judgment to B&O, the district court also denied Parker leave to file his amended and supplemental complaint. It is difficult to extract the reason for this denial from the text of the district court's order. The district court did state "that the proffered amended and supplemental complaint [did] not substantially alter the nature of plaintiff's original cause of action." This might be construed as a finding that the proposed amendment would have been futile. We find the court's rejection of the amended complaint troubling, regardless of whether this interpretation of the order is correct. If the court meant to rely on some ground other than futility, then it did not give a sufficiently clear statement of its reason. If the court did intend to rely on futility, we believe it erred in interpreting Title VII.

### A. The Need for a Statement of Reasons

Given the opacity of the district court's order, it is possible that the trial court considered denial of leave to amend justifiable on some unstated ground. B&O argues on appeal that Parker's attempt to amend was tainted by undue delay, that the change of counsel was no excuse, and that B&O has been prejudiced in some way by the lapse of time. B&O may reiterate these arguments on remand, but it is evident from the trial court's order that no explicit findings were made in response to these contentions.

The Supreme Court has made clear the need for an explicit statement of reasons when a district court denies a party leave to amend his pleadings:

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. . . . If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (citation omitted). *See Gumer v. Shearson, Hammill & Co.*, 516 F.2d 283 (2d Cir. 1974); *Spann v. Commissioners of District of Columbia*, 443 F.2d 715 (D.C.Cir.1970).

**B.** *Opposition to Unlawful Practices*

■ Parker's amended complaint included a claim of unlawful retaliation under Title VII. Section 704(a) of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against any employee either "because he has opposed any practice made an unlawful employment practice" under Title VII (the "opposition" clause), or "because he has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing" under Title VII (the "participation" clause). 42 U.S.C. § 2000e–3(a) (1976).[11] Parker's claim was based on the opposition clause.[12]

The participation clause speaks in clear, absolute terms, and has accordingly been interpreted as shielding recourse to the EEOC, regardless of the ultimate resolution of the underlying claim on its merits. *See, e. g., Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir. 1969). The opposition clause, however, has received conflicting interpretations—some courts have held that its language demonstrates that opposition is protected only if the challenged practice is indeed "made an unlawful employment practice" by Title VII, *see, e. g., Kinard v. National Supermarkets, Inc.,* 458 F.Supp. 106 (S.D.Ala.1978); *EEOC v. C & D Sportswear Corp.,* 398 F.Supp. 300 (M.D.Ga. 1975), while others have found that protection under section 704(a) extends to situations where the employee reasonably believes the practice to violate Title VII, *see, e. g., Berg v. La Crosse Cooler Co.,* 612 F.2d 1041 (7th Cir. 1980); *Sias v. City Demonstration Agency,* 588 F.2d 692 (9th Cir. 1978); *Hearth v. Metropolitan Transit Comm'n,* 436 F.Supp. 685 (D.Minn.1977).

The district court's order might be read as rejecting Parker's proffered amendment because it added nothing to the original complaint. If so, the district court must have concluded that Parker's opposition to B&O's affirmative action plan would not be protected by Title VII if that plan was lawful. We reject this interpretation of the opposition clause, because making the protected nature of an employee's opposition to alleged discrimination depend on the ultimate resolution of his claim would be inconsistent with the remedial purposes of Title VII.

The obvious concern of Congress, in both the opposition and participation clauses, was to protect the employee who dares to speak out against his employer's hiring practices. The enforcement scheme Congress chose for Title VII relies heavily on the initiative of aggrieved employees, whose efforts in the public interest would be severely chilled if they bore the risk of discharge whenever they were unable to establish conclusively the merits of their claims.

Moreover, by extending protection to employees who oppose discriminatory practices without recourse to the EEOC, Congress encouraged voluntary internal attempts to remedy discrimination. The remedial purposes of Title VII would be ill served by telling employees that they can be sure of protection only if they limit their complaints about discrimination to formal EEOC filings, and that internal opposition, though encouraged, is undertaken "at the accuser's peril," *EEOC v. C & D Sportswear Corp.,* 398 F.Supp. 300, 306 (M.D. Ga. 1975).

The record contains no indication that Parker's opposition to affirmative action was expressed disruptively, insubordinately, or in a manner damaging to B&O's legiti-

---

**11.** The full text of § 704(a) is as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e–3(a) (1976).

**12.** Parker's claims under the opposition clause concern events in 1977 preceding his filing of an EEOC charge.

mate management interests. Courts have recognized the need to balance the employer's interest in smooth functioning of his business against employees' interest in achieving internal resolution of discrimination disputes, and have sought to determine on a case-by-case basis when excessively forceful opposition forfeits the protection of section 704(a). *See, e. g., Pendleton v. Rumsfeld,* 628 F.2d 102 (D.C.Cir.1980); *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222 (1st Cir. 1976). An employer has, however, no legitimate interest in retaliating against an employee for opposition per se, and the fact that a nonfrivolous claim is ultimately resolved in favor of management does not justify an attempt to suppress the claim by penalizing the employee who raised it. The employer is sufficiently protected against malicious accusations and frivolous claims by a requirement that an employee seeking the protection of the opposition clause demonstrate a good faith, reasonable belief that the challenged practice violates Title VII. *See Sias v. City Demonstration Agency,* 588 F.2d 692 (9th Cir. 1978); *cf. Monteiro v. Poole Silver Co.,* 615 F.2d 4 (1st Cir. 1980) (opposition not in good faith).

B&O argues that most of the cases rejecting a narrow reading of the opposition clause are inapposite here, because they involve mistakes "of fact" rather than mistakes "of law." It is not clear to us that a conclusion that B&O's affirmative action efforts were on the permissible side of some juridical line would necessarily reflect an error of law rather than of fact in Parker's opposition, but in any case we find the suggested distinction irrelevant to the purposes of section 704(a). Characterization of the employee's mistake as one of fact or of law affects neither the employee's interest in acting on his beliefs nor the employer's interest in asserting legitimate management prerogatives. We agree with the Seventh Circuit's conclusion in *Berg v. La Crosse Cooler Co.,* 612 F.2d 1041, 1045–46 (7th Cir. 1980)—a layperson should not be burdened with the "sometimes impossible task" of correctly anticipating how a given court will interpret a particular statute.

Opposition based on reasonable belief should be protected from retaliation.

We express no opinion, of course, on the merits of Parker's retaliation claim. We hold only that Parker's proposed amendment would not be made futile as a matter of law by a finding that B&O's affirmative action plan was lawful under Title VII.

Thus, the Supreme Court's *Weber* decision does not provide a basis for denying Parker leave to amend. If the district court intended to rely on the legal futility of a claim under the opposition clause of section 704(a), the court was mistaken. If the court relied on some other reason, it is impossible for us to discern from the text of the order what that reason was. On remand, the court should either grant Parker leave to file his amended and supplemental complaint, or make appropriate findings and state its reasons for denial.

## IV. CONCLUSION

We recognize that the law of affirmative action under Title VII is presently in an unsettled state, and that our opinion does not clearly delineate the boundary that separates admirable private remedies from unlawful discrimination. As the Supreme Court recognized in *Weber,* Congress has mandated a delicate balance between the rights of minority and white employees. Although an employer's good faith attempts to preserve that balance deserve the respect of the courts, an adequate factual record is necessary before the success of his attempt can be determined. The difficulty and the importance of the issue counsel us to defer continuation of the task the Court began in *Weber* until the factual setting is more fully elucidated.

The present record provides more questions than answers about B&O's affirmative action efforts. The company has not described its policies or demonstrated their effects, except by the most conclusory protestations of innocence. Under these circumstances, we hold that summary judgment was premature. The district court needed a fuller statement of the relevant

facts before it could determine the legality of the challenged program.

We also hold that leave to file the amended and supplemental complaint was improperly denied. The proffered complaint was not futile as a matter of law, and the court gave no other reason for the denial. The motion should be reconsidered, and the court should state more fully the reasons for the resulting disposition. For these reasons, the judgment of the district court is

*Reversed and remanded.*

TAMM, Circuit Judge, concurring in the result:

Plaintiff appeals from the district court's denial of leave to file an amended complaint and from its grant of summary judgment for the defendant. I join the majority in reversing the district court on these matters, but am unable to join in the court's opinion with its resolution of matters not properly before us.

Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint "shall be freely given when justice so requires." The Supreme Court's opinion in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), quoted by the majority at page 1018, makes clear that the trial court's discretion in this matter is limited, and that leave to amend should not be denied in the absence of an apparent or articulated reason for denial. I believe that the only reason given by the district court in this case—"the proffered amended and supplemental complaint does not substantially alter the nature of plaintiff's original cause of action"—was in error. At least as to the addition of the retaliation claim, the amended complaint did substantially alter the original complaint. The retaliation action arose under a separate provision of Title VII and had a somewhat different factual basis. In the absence of another reason for denial of the amendment, plaintiff deserves his day in court on this claim.

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." On review of a summary judgment, "the party against whom summary judgment was granted has the benefit of all reasonable evidentiary inferences that can be drawn in his favor." *Toney v. Bergland*, 645 F.2d 1063 at 1066 (D.C.Cir.1981) (per curiam). I believe that the lack of evidence on the record on the actual workings of the defendant's "affirmative action" prohibits a conclusion at this point that the defendant did not violate Title VII. As the majority points out, not only is the Seniority Modification Agreement absent from the record, but apparently the defendant "waived" certain requirements of this Agreement in its actual hiring. The basis upon which these waivers were made is not even addressed in the record. *United States Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), clearly did not remove from the reach of Title VII all hiring done under the color of "affirmative action." The district court must examine more closely the hiring practices of the defendant to determine whether a violation of Title VII has occurred.

I believe that the majority opinion ranges more widely than is necessary for our decision today. This unnecessary expansiveness, present to some extent in the majority's discussion of *Weber* and of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), on the summary judgment question, is most evident in its discussion of 42 U.S.C. § 2000e–3(a) (1976). The question properly before this court is whether the district court erred in denying plaintiff leave to amend. As discussed above, one significant difference between the original complaint and the amended complaint is the presence of the retaliation claim in the latter. Believing that the district court erred in concluding that the amended complaint does not "substantially alter" the original cause of action, I would reverse the denial of leave to amend. At this point, I would return the matter to the district court.

The majority opinion takes a different approach. It construes the district court's

denial of leave to amend to mean that the district court was deciding that the amendment would have been futile. It then construes this conclusion of futility to mean that the district court had decided sub silentio a question of first impression in this circuit, a question not even raised by the original complaint: whether the "opposition clause" of 42 U.S.C. § 2000e–3(a) (1976) prohibits an employer from retaliating against an employee who opposes an employment practice he reasonably and in good faith believes to be unlawful, but which in fact is lawful. The majority engages in this tortured logic so that it can decide a question which may not even be raised by the facts of this case. If the defendant's "affirmative action" is found unlawful, for example, the majority's decision on the opposition clause question would be wholly premature. I cannot join in an action so inconsistent with our status as a court of *review.*