**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**IMPERIAL MANAGEMENT COMPANY, a/k/a Hardaway Management Company, Defendant.**

Civ. A. No. 86–2533–W/B.

United States District Court, W.D. Tennessee, W.D.

Sept. 18, 1991.

Katherine W. Kores and George C. Bradley, Sr. Trial Atty., E.E.O.C., Memphis, Tenn., for E.E.O.C.

Joe McIlvain, Jr., Memphis, Tenn., for defendant.

Mark Allen, Agee, Allen, Godwin, Morris & Laurenzi, Memphis, Tenn., for Duckworth.

## MEMORANDUM OPINION

WELLFORD, Senior Circuit Judge, sitting by designation.

The Equal Employment Opportunity Commission ("EEOC") brought this action under Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e, *et seq.*) charging defen-

dant Imperial Management Company, a/k/a Hardaway Management Company (collectively referred to as "Hardaway"), apartment complex managers, with sex discrimination. The EEOC alleges that the defendant retaliated against the charging party, Carolyn Drinkwater ("Drinkwater"), who also intervened in this case as a party plaintiff, and her supervisor, Marilyn Albert Duckworth ("Duckworth"), both of whom were discharged by defendant. Drinkwater, was employed by defendant at its Lakeside Downs apartment complex in Memphis from December 15, 1981 through January 7, 1983. Drinkwater had been employed at Lakeside Downs in the same position prior to December 15, 1981 under a different property management company.

Drinkwater experienced medical difficulties requiring hospitalization. She was released on December 17, 1981, from the hospital by her treating physician, Dr. Phillip Mintz. Drinkwater claims that he gave her a statement indicating that she needed to be off additional days for her recuperation. The statement, a subject of controversy, was not made available until the eve of trial and defendant contests its authenticity.

In Duckworth's deposition, she indicated the doctor's letterhead was on the document and that it was signed by the doctor. The document Drinkwater introduced into evidence was not signed by the doctor nor was it on his letterhead. In her deposition, Duckworth indicated she could not remember going to defendant with the document, but she testified that she did take it to John Cooke, her supervisor at the time.[1]

In any event, Drinkwater provided a copy of a statement to her supervisor, Duckworth, requesting thirty days leave of absence. After receiving no answer to her request, Drinkwater complained to Duckworth that she felt herself subject to discrimination because she was aware that a male employee, Maurice Martin, had been granted what she thought was a thirty day medical leave. (Martin was a custodial employee; it was not clear whether there were different medical circumstances involved as to him, and the only documented proof submitted was an authorized four day leave signed by Duckworth for Martin to have eye surgery). In any event, Drinkwater requested a leave of absence, which was denied by Cooke. Drinkwater's belief that she had been discriminated against because of her sex was communicated to Cooke by Duckworth about the first week of January, 1983.

On January 7, 1983, Cooke met with Duckworth and Drinkwater and advised them they were being terminated due to a "permanent administrative change." Defendant contends that Duckworth and Drinkwater were discharged because of the high vacancy rates and delinquency in rent payments at Lakeside Downs. Cooke testified that the delinquency rates at Lakeside Downs increased to an unacceptable level prior to the discharge of Duckworth and Drinkwater. Cooke admitted under cross-examination, however, that he had never raised the issue of delinquency rates with Drinkwater or Duckworth while they worked at Lakeside Downs. Defendant introduced no documentary evidence concerning delinquency rates. Cooke also testified that Duckworth and Drinkwater were responsible for the high delinquency rate because they failed personally to visit tenants to collect rents. Duckworth testified, however, that she was never told that one of her responsibilities was to visit tenants for the purpose of collecting back rent.

The record shows that in March of 1983, following the discharge of Duckworth and Drinkwater, the rents were reduced, resulting in the vacancy rates coming down. Both Duckworth and Cooke testified that when rents were increased by 10%, it was expected that an increase in the vacancy rate would occur. Casey Allen, a white male, who had also been discharged by defendant, testified he had never received a reprimand during his employment and had never been told that his employment was unacceptable prior to his discharge.

---

1. The total time off work requested by Drinkwater, however, would have amounted in this case to about two months—early December to February.

Drinkwater, a high school graduate, testified that she sought employment after her termination. She was married with several children. Drinkwater had experience as a dental assistant, leasing agent, assistant resident manager, and a clerk/assistant manager for Southland Corporation at the time of her termination. Drinkwater applied at several locations for employment, but did not seek work in apartment management. She felt that she would be unable to find further employment in the apartment leasing industry in Memphis.

Drinkwater did work for the Southland Corporation as an assistant manager and in other capacities in a 7/11 store from 1979 until 1986. She was not employed again until 1988 when she worked at the Hair Kutt Plus, B.J.G., Inc., and at St. Augustine Church and School. In 1989 and in 1990, Drinkwater worked as a hair stylist, with the Shelby County government as a deputy register and at other employment. Drinkwater suffered a work-related injury for some time in 1985, and was unable to work following a car accident for six months in 1987. At the time of her termination in January 1983, Drinkwater was making $164 per week for forty hours per week, or $4.10 per hour, plus being furnished an apartment. Defendant furnished both Drinkwater and Duckworth letters of recommendation to assist them in obtaining future employment.

After her discharge, Duckworth was not gainfully employed for approximately a year and one-half from January, 1983 to July, 1984. She was a student during that period of time. She has been gainfully employed by Federal Express since July of 1984.

In addition to the instant charge, Drinkwater has filed a number of EEOC discrimination charges, and, at trial, still had a claim pending against the Southland Corporation. Drinkwater has also claimed and

received workman's compensation benefits for some period of time due to injuries received while working for the Southland Corporation. She was unable to work for a considerable part of this period following her termination.

Plaintiffs pursue this case as a retaliation claim, not a sex discrimination claim. This court notes that no claim of substantiated sex discrimination has been established by Drinkwater or by EEOC under the circumstances here presented. Drinkwater was aggrieved that her request for a leave was denied, but she has not shown that the refusal, even if arbitrary, was motivated by sex discrimination. The claim, however, is that she was discharged in retaliation for making what the court concludes was an unsubstantiated claim for sex discrimination.

The court concludes that Drinkwater's claim, involving a "feeling" of sex discrimination, was communicated to defendant. Drinkwater's charge made in March of 1983, asserted that after being discharged from the hospital on December 17, 1982,[2] she asked Duckworth, her female manager, for a thirty day leave for rehabilitation purportedly based on her doctor's advice.[3] Duckworth allegedly told Drinkwater that "she needed" her and that if she did not return she would be terminated. Duckworth testified that when she brought Drinkwater's leave request to Cooke, he said he could not guarantee her position for thirty days. Drinkwater, according to her charge, went back to work but felt that if she were a male (like Martin), Drinkwater "would have made provision" for the leave. Drinkwater indicated that Duckworth informed Cooke of Drinkwater's "feelings" and then both were discharged on January 7, 1983. Duckworth allegedly advised that Cooke "felt that [Drinkwater] would make trouble for the company," and indicated that the reason given, "a management

---

**2.** In her testimony, Drinkwater stated that the problem was a stomach ulcer.

**3.** The circumstances of the doctor's support for the requested leave of absence, moreover, were not clear. The unsigned report, dated 12/30/82, is a form headed "certificate for re-

turn to school or work," indicating that Drinkwater had been under Dr. Mintz's care for approximately five months to "Present" and that she "is able to return to school/work on February 1, 1983." Dr. Mintz had misplaced some medical records.

change," was pretextual. Duckworth filed no charge. Defendant did not establish that Drinkwater and Duckworth were unsatisfactory employees.

Although I have concluded that the sex discrimination claim was, in fact, not justified, this fact does not necessarily preclude a claim of retaliation, because it is not a prerequisite that plaintiff be correct in the underlying claim. *De Anda v. St. Joseph Hospital,* 671 F.2d 850, 857 (5th Cir.1982). The underlying claim must, however, be reasonable, made in good faith and based upon a sincere belief, even if mistaken. *EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008 (9th Cir.1983); *Rucker v. Higher Educational Aids Bd.,* 669 F.2d 1179 (7th Cir.1982); *Parker v. Baltimore & Ohio Ry. Co.,* 652 F.2d 1012, 1020 (D.C.Cir.1981).

Drinkwater was working the night shift and alternate weekends at a nearby convenience store for Southland Corporation while employed by defendant. Southland purportedly granted her medical leave at the time involved in this dispute; this fact may indicate some arbitrariness in defendant's denial.

It is a close question on this record, but I find that Drinkwater did convey a complaint of sex discrimination, which, although mistaken, was made in good faith and was sufficiently reasonable to meet the test for a retaliation claim.

Unfortunately, there was considerable administrative delay in processing the Drinkwater charge. There has also been considerable delay in reaching trial following the filing of the complaint and amended complaint by the EEOC in this cause. Drinkwater made a charge of sex discrimination and retaliation approximately fifty-five days after she was terminated. Duckworth never filed any charge. The EEOC made a determination of probable cause on the Drinkwater charge on April 23, 1985 (over two years and three months after the episode in question). The complaint, making reference *only* to Drinkwater, was filed

July 10, 1986.[4] Defendant sought a more definite statement, and amplification was furnished, again referring *only* to Drinkwater's claim in October of 1986. It was not until late August of 1987 that the EEOC first notified defendant of its desire to add the Duckworth claim of retaliation.

The general rule on filing charges under Title VII procedures is set out in *Geromette v. General Motors Corp.,* 609 F.2d 1200 (6th Cir.1979), *cert. denied,* 446 U.S. 985, 100 S.Ct. 2967, 64 L.Ed.2d 841, *reh'g denied,* 448 U.S. 912, 101 S.Ct. 29, 65 L.Ed.2d 1174 (1980):

> It is clear from the above that no charge was filed either with the Michigan Civil Rights Commission or with the EEOC within 180 days from the date of plaintiff's discharge. Under Michigan as well as federal law her Title VII cause of action is barred. This was the holding in *Olson v. Rembrandt Printing Co.,* 511 F.2d 1228 (8th Cir.1975 en banc) in a well-written opinion by Chief Judge Gibson.

*Id.* at 1202. *See also EEOC v. McCall Printing Corp.,* 633 F.2d 1232 (6th Cir. 1980); *Rasimas v. Michigan Dep't of Mental Health,* 714 F.2d 614 (6th Cir.1983), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). There is no basis in this case for equitable tolling of the time period involved, nor is there any basis for estoppel against defendant who raised the timeliness issue when first apprised of EEOC's desire to add Duckworth as a beneficial party claimant. Even if sympathetic to Duckworth's claim, I must conclude that a delay in notice to defendant to any claim on the part of Duckworth for four and a half years bars the claim under Title VII's express language. I conclude that it would be inherently inequitable and unfair to require the Management Company to defend itself against such a claim, *absent any formal notice, charge or negotiation effort on that claim* during such a lengthy period. The amended complaint, adding Duckworth's claim, was a new cause of action. Judgment on the Duckworth retali-

---

**4.** The complaint sought that defendant make *Drinkwater only* whole and be ordered to stop

its retaliation actions as to Drinkwater. No reference is made to others similarly situated.

ation claim must therefore be entered for defendant.

 Difficult and close as has been the issue of liability on the Drinkwater charge, it is perhaps even harder on this record to devise a fair and reasonable remedy for the retaliation. First, the court finds that Drinkwater herself was less than candid in her testimony concerning her efforts to work other than at Southland following discharge. She has barely carried her burden on the retaliation claim and has failed to carry her burden on the sex discrimination claim. She claimed to be disabled when discharged and had apparently achieved a leave of absence from her other employer, Southland.

The court finds that Drinkwater took a convalescent period from full-time employment for some five months after her termination by defendant. She claimed not to be able to work during this period. (She was paid eight days vacation time). She received letters of recommendation from her former employer and supervisor. (In 1983, Drinkwater earned over $6,300 while she continued to be employed by Southland, and she and her husband together received over $24,000 in wages with no further breakdown as to the amount earned by her husband).[5] Drinkwater testified that she went back for further hospitalization in 1983 following termination.

Drinkwater does not explain why or how her earnings at Southland increased to $8816 in 1984, but $2594 represented sick pay. At some juncture she started hair styling, and cosmetology training, and in 1985 her Southland earnings declined to about $2600, plus $300 in profit sharing. In 1986, before termination by Southland, she received a total of nearly $3,000. She also acknowledged receiving a workman's compensation settlement from Southland. In all events, Drinkwater received substantial sick pay benefits from Southland during several years following her termination by defendant. At some point in the several years following, she studied and received a real estate license and took courses at State Tech School in Memphis.

Unfortunately, many years have passed since her discharge. She was involved in serious home and domestic stress and in a very serious automobile accident precluding her working actively for a considerable period of time. The court awards Drinkwater $6,000 in back pay under all the circumstances, and also $4,000 representing the value of the loss of her apartment previously furnished by defendant, a total of $10,000. While full reinstatement may be a usual part of a "make whole" award, under the circumstances here the court will not require defendant to furnish Drinkwater and her family an apartment nor require defendant to rehire plaintiff as a resident manager or assistant manager. Defendant is directed, however, provided plaintiff is now demonstrated to be sufficiently healthy to work regularly, to afford plaintiff another position, the next available vacancy for which she is qualified, at a rate of at least $5.50 an hour, if plaintiff desires to return to work for defendant.

It is so ORDERED.

---

5. Drinkwater and her husband reported in 1983 $3190 received in unemployment compensation, and Drinkwater also received $300 from Southland as profit sharing.