**Paul BACHMAN, Plaintiff,**

v.

**BOARD OF TRUSTEES OF the UNIVERSITY OF the DISTRICT OF COLUMBIA, Defendant.**

Civ. A. No. 86–74 SSH.

United States District Court, District of Columbia.

Nov. 8, 1991.

Gary T. Brown, James McConville, Washington, D.C., for plaintiff.

Domenique Kirchner, Asst. Corp. Counsel, Washington, D.C., for defendant.

OPINION

STANLEY S. HARRIS, District Judge.

Plaintiff, Paul Bachman, brought suit against the Board of Trustees of the University of the District of Columbia (UDC) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging

---

**35.** Plaintiff's Consolidated Opposition at 238.

racial discrimination in UDC's failure to promote him to the rank of Full Professor.

A two-week bench trial was conducted in September 1988. The parties submitted post-trial briefs in late spring 1989. The Court regrets the delay in resolving this case, caused in part by the difficulties posed by this matter as well as by the exigencies of an ever-burgeoning criminal calendar.[1]

On August 29, 1988, this Court granted in part and denied in part defendant's motion for summary judgment. The motion was granted with respect to denial of promotion for academic years 1984–85, 1986–87, and 1987–88. The motion was denied with respect to academic year 1985–86, and defendant's failure to promote Bachman for that year alone was the subject of trial.[2] Notwithstanding the Court's ruling on the motion for summary judgment, which was based in large measure on plaintiff's failure to set forth issues of material fact in opposing the motion, the Court allowed plaintiff to introduce some evidence relevant to UDC's alleged history of discrimination and to flaws in the procedures used for making promotion decisions in other years.[3]

### Findings of Fact

Paul Bachman, a white male, was hired as an Assistant Professor by Federal City College (FCC) in 1971.[4] Bachman holds a Bachelor of Science degree from Wilkes College, a Master of Business Administration from the University of Scranton, and a Master of Arts from St. Francis College.

In 1978, Bachman received a Doctorate of Business Administration (DBA) from The George Washington University. (This, in academic parlance, constitutes the "terminal degree" for Bachman's area of specialization.) Throughout his tenure at FCC and UDC, Bachman has been employed by the College of Public Management. Bachman was a faculty member of the Department of Management.[5] In 1979, he was promoted to the rank of Associate Professor.

### Overview of the Promotion Process

The District of Columbia Faculty Association represents the faculty members within the bargaining unit of faculty at UDC. The collective bargaining agreement between UDC and the Association is embodied in the Master Agreement, which sets forth procedures and minimum eligibility standards for promotion. For promotion to Full Professor, applicants must have three years of service at the next lower rank, Associate Professor; must have a terminal degree, defined as a doctorate; and must have an evaluation rating of " 'good' or better for the last academic year."

Under the Master Agreement, each department has the responsibility of forming its own Committee on Promotions. That committee "recommend[s], in order of priority, the department's candidates for promotion." The departmental committee's recommendation is forwarded to the Collegewide Committee on Promotions, which "review[s] the recommendations of the various department committees and ... recom-

1. The Court does not believe that this delay has caused undue hardship, however, given that the objective sought by plaintiff when this suit was initiated—promotion to the rank of Professor—was achieved prior to trial. Indeed, it is the Court's view that this case proceeded to trial in large measure based on the availability of attorney's fees should plaintiff prevail, rather than on the need to seek a judicial resolution of the underlying controversy.

2. Plaintiff's motion for reconsideration of the summary judgment rulings, made on the eve of trial, was denied.

3. Based on that evidence, it is likely that but for the summary judgment rulings, the Court could have found that plaintiff should have been promoted in academic year 1984–85, the year in

which Beverly Farrall was promoted while plaintiff was not.

4. FCC was one of three predecessor institutions to UDC, which was created by the merger of FCC, Washington Technical Institute, and D.C. Teacher's College in 1977.

5. Nine departments comprise the College of Business and Public Management: accounting, business economics and finance, business education and office administration, management, marketing logistics and public contracts, computer information and systems sciences, secretarial science, management technology, and accounting technology.

mend[s], in order of priority, the College's candidates for promotion." Master Agreement, Section XII. Disagreements with the recommendations of either the departmental or collegewide committees are brought before the Faculty Review Committee, whose grievance review appears to be procedural rather than substantive.

Each academic year, a certain number of promotion slots are allocated to each college. The Vice–President for Academic Affairs and the President match the number of available slots to the priority rankings of each college's candidates.[6] That is, if a particular college has only one slot allocated to it, then only the top-ranked candidate will be promoted. If three slots are available, then the top three candidates will be promoted.

Supplementing, but not superseding, the minimum eligibility requirements of the Master Agreement are the UDC Faculty and Administrative Personnel Policies,

which provide the most generalized of promotion criteria: education, teaching ability, scholarship and professional growth, service to the University, length of service, and service to the community.

In practice, at least within Bachman's college and department, decisions as to what weight to accord each of the criteria listed above were made after the candidates for promotion for a given year were known. Judith Ramey, a witness on behalf of UDC, testified that as a member of the Departmental Promotion Committee, the procedure was to (1) identify the candidates, (2) review the materials they submitted, (3) establish the criteria to be used for ranking purposes, and (4) vote. For example, for academic year 1985–86, candidates applied for promotion in December 1984. In January 1985 the Departmental Committee adopted the following criteria and weights to be used for evaluating candidates.

|  | Maximum Points Available |
|---|---|
| Teaching | 35 |
| Scholarship | 35 |
| University Service | 15 |
| Community Service | 15 |
|  | 100 |

Those weights differ from the ones used in preceding academic years. Indeed, the relative weight for each area generally changed from year to year.[7]

Two points become immediately obvious. First, the candidates did not know from year to year how they were to be evaluated in terms of the weighting of criteria due to the inconsistencies. Thus, they could not

**6.** There is no review of an individual candidate's merits by either the Vice–President for Academic Affairs or the President.

**7.** In academic year 1984–85, for example, teaching was allocated 15 points, scholarship was allocated 30, and the category lumped together in the text as University service was allocated 30. It should be noted, moreover, that these point totals were created *after* the candidates had already been ranked and their materials had been forwarded to the Collegewide Committee. The Collegewide Committee had requested the Departmental Committee to provide some basis for its rankings. Upon doing so, the rank-

focus their applications in any meaningful way nor would they necessarily benefit from trying to improve their standing in a particular area. Second, and more important to this matter, the process was ripe for manipulation. The relative strength or weakness of a candidate in a certain area could be overcome by giving that category greater or lesser weight.

ings changed and plaintiff was dropped from being ranked second to being ranked third. Although the Departmental Committee had originally recommended promoting plaintiff, it changed that recommendation after creating its post-hoc rationalization at the behest of the Collegewide Committee. Although the Court is not making a determination of whether plaintiff was discriminated against for academic year 1984–85, that year is instructive in showing how the process is subject to manipulation.

The criteria were weighted differently yet again for academic year 1986–87.

One other procedural aspect is worthy of mention. The members of the Departmental Committee were drawn from all those faculty members in the department not seeking promotion for that academic year. Thus, candidates for promotion to Full Professor were evaluated by Assistant and Associate Professors, as well as by Full Professors.

Dr. George LaNoue, an expert on behalf of plaintiff, testified that there could not be a worse system.[8] First, comparisons were not abstractly objective, but rather were made on a year-to-year basis. Accordingly, a candidate's chances for promotion varied depending upon who the other candidates were in a given year. Second, candidates from different ranks were all thrown in the same pool. That is, someone seeking promotion to the rank of Associate Professor did not "compete" solely against other candidates for promotion to that rank. To evaluate their relative merit, different criteria geared to particular promotion ranks should have been used. The UDC process in effect obliged the committees to compare apples and oranges. Finally, the fact that the weighting system changed every year, after the candidates were known, was an invitation to skew the process.

In another anomaly, a candidate's ranking by his or her Departmental Committee was of great importance when it came time to be ranked by the Collegewide Committee, according to Dean William Crump, its head. If a professor was ranked first by his department—even if that ranking occurred solely by virtue of that person's being the only candidate—it could work in favor of the candidate.[9]

From the testimony presented, it also appears that very short shrift was given to the relative merits of candidates' academic achievements. Despite testimony from some faculty members to the contrary, which testimony was not credible, the process of evaluating accomplishments was primarily one of tallying. The number of "items" submitted by a candidate as support for achievement in any category was important; the quality was not. For example, Antonia Nowell, who testified for UDC, was a member of the departmental Committee on Promotions during several years, including academic year 1985–86. She could not recall any discussion of the merits or quality of any of the supporting materials proffered by any candidate. Similarly, Judith Ramey stated that if a candidate had written a book, for example, "we would just look to see if they wrote it." The material was "too voluminous" to do more than "itemiz[e]" or "skim" it. Although she testified that the committee was "not rushed" and could take its time in evaluating materials, when asked whether it would take up to two hours to review all of the supporting materials she stated that she did not think it took that long.

In addition to these apparent flaws in the basic procedures governing promotions, there was ample testimony that the invitation to manipulate was heeded. For example, Emmanuel Chatman, a member of the College Promotions Committee in 1983–84 and 1984–85, testified that Dean Crump, who chaired the Collegewide Committee, would always indicate his general attitude toward each applicant.[10] He further testified that Dean Crump disfavored promoting plaintiff. In 1984–85, the same year in which the Collegewide Committee requested the Departmental Committee to provide a basis for its rankings (*see supra* note 7), Chatman testified that Crump would indicate whom he supported, would know the applicants' backgrounds, and thereafter would establish the criteria. It was Chatman's belief that Dean Crump had a strong

---

**8.** Dr. LaNoue's academic area is the law and politics of education. He was accepted as an expert in the following areas: characteristics of academic careers, academic personnel management, discrimination in higher education, the application of civil rights law to higher education faculty, the application of social science theory and methodology to civil rights issues, the effect of the litigation process on civil rights plaintiffs, and the reputation of higher education institutions.

**9.** In 1984–85, for example, Professors Truelove and Ross were the only promotion candidates from their respective departments and each was highly ranked by the Collegewide Committee.

**10.** Chatman is black, as is Dean Crump.

preference for blacks, particularly black women. Chatman noted that the person preferred by Dean Crump in 1983–84 was "strong on research." In 1984–85, however, Crump's leading candidate, Beverly Farrall, a black woman, was weak on research. Chatman also testified that Crump "kept track" of what were supposed to be officially secret ballots through the use of different colored pens and paper, which he distributed.

Dean Crump chaired the Collegewide Committee in 1985–86, the year at issue.

*Promotion Process in Academic Year 1985–86*

For academic year 1985–86, Dr. Carlyle Hughes, Chair (white), Dr. John Attaway (black), Dr. Beverly Farrall (black), Dr. Antonia Nowell (black), Dr. Lois Poag–Rhodes (black), Dr. Yearn Choi (Korean), and Judith Ramey (black) comprised the Departmental Promotions Committee. Three members of the department applied for promotion: plaintiff, Dr. A. Vincent Ashe (black), and Steven Stryker (white).

On January 23, 1985, the Departmental Committee met to review and "evaluate" the materials submitted by plaintiff. Each member filled in a secret ballot. The next day, Ashe's and Stryker's materials were reviewed. Each of those applications was missing some backup material, and Ashe and Stryker were allowed to provide additional information to the committee.[11] On February 5, 1985, the Committee met again to review and "evaluate" Ashe's materials.[12] Each member completed a secret ballot with respect to Dr. Ashe. At the same meeting, the Committee voted unanimously that Stryker did not meet the eligibility requirements and his candidacy was not accorded further review.

As noted previously, the criteria and weights for 1985–86 were: teaching, 35 points; scholarship, 35 points; University service, 15 points; and community service, 15 points. According to the Department's records regarding the submissions, plaintiff submitted documentation about his development of several chapters in a managerial economics text, the writing of five vocational pamphlets, the presentation of several workshops, and the development of instructional materials for three courses. In terms of University service, plaintiff had served on four committees and had updated student records in his department. With respect to community service, plaintiff had evaluated proposals submitted to the Small Business Administration. Dr. Ashe had presented papers, completed research in the UDC self-study program, had taken some courses, and had attended about a dozen conferences and workshops. Dr. Ashe had 11 activities listed under community service and another 11 items listed under University service.

With respect to both candidates, the review and evaluation of materials appeared to have been one of tallying, rather than of subjective review of the relative merit of a given activity or piece of scholarship. The secret ballots were totalled and averaged for each candidate.[13] Plaintiff's average score was 82.71; Dr. Ashe's average was 86.51. Accordingly, although both candidates were recommended for promotion, the Committee ranked Dr. Ashe first. From the testimony presented by members of the Committee, and from the ballots themselves, it is obvious that Dr. Ashe's superior ranking was based on his community and University service.[14]

On February 13, 1985, plaintiff wrote to Dean Crump, objecting to having been ranked second to Dr. Ashe. Plaintiff stated that he was more qualified than Dr. Ashe and that Dr. Ashe had been allowed to supplement his application while plaintiff had been denied that opportunity for aca-

---

**11.** This same courtesy had been refused plaintiff the year before when questions had been raised about some of his supporting materials.

**12.** Although the Committee had also met on January 31, 1985, it conducted no business because there was not a quorum present.

**13.** There was conflicting testimony as to whether the ballots were averaged on January 23 for plaintiff or on February 5 for both candidates.

**14.** It should be kept in mind that the relative weights were not decided upon until after the candidates were known.

demic year 1984–85.[15] Crump responded that the departmental ranking "may, or may not, be significant."

On March 22, 1985, the Collegewide Committee met to consider the applicants for promotion.[16] In addition to Ashe and plaintiff, the candidates were Dr. Sandra Yates (black), Dr. Emmanuel Chatman (black), and Dr. Connie Ross (black). Ashe, Yates, and plaintiff sought promotion to Full Professor. Chatman and Ross sought promotion to Associate Professor. Two promotion slots were available.

At that meeting, the Committee decided to use the same criteria and weights it had used the previous year: department evaluation, 15; scholarship, 25; professional growth, 25; University service, 15; college and department service, 15; community service, 5; teaching, 10. Each department chair summarized the applications of his or her candidates. The underlying materials had been available for review earlier, although Melanie Brown testified that the Committee looked primarily at the number of accomplishments listed in each category. Dean Crump testified that his committee compared Associate Professors with Associate Professors and that they were judged more stringently than Assistant Professors seeking promotion. Nevertheless, there were no distinctions made between the two types of candidates in terms of separate rankings.

After the ballots were completed and scored, Dr. Yates was ranked first, Dr. Chatman second, plaintiff third, Ashe fourth, and Ross fifth. On March 27, 1985, Dean Crump officially recommended that the two promotion slots be awarded to Yates and Chatman, based on their rankings.

On March 28, having been informed of the results by Brown, plaintiff requested the Faculty Review Committee to review the Collegewide Committee's recommendation. The Faculty Review Committee concluded that it could not establish any procedural violations.

In July 1985, plaintiff received his contract notice for the upcoming academic year, which kept him at the rank of Associate Professor. Plaintiff then appealed to the University President, who denied his appeal on December 4, 1985.[17] On December 20, 1985, plaintiff filed charges with the Equal Employment Opportunity Commission (EEOC).

*Conclusions of Law*

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established a framework allocating the burdens of proof in Title VII cases. First, the plaintiff must establish a prima facie case. For promotion cases, including ones involving white plaintiffs, the prima facie case required by *McDonnell Douglas* is a showing that (1) the plaintiff "belongs to a protected group," (2) the plaintiff "was qualified for and applied for" the promotion, (3) the plaintiff "was considered for and denied the promotion," and (4) "other employees of similar qualifications who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied." *Daye v. Harris*, 655 F.2d 258, 262 n. 11 (D.C.Cir.

---

**15.** Part of Bachman's argument was that he had two Master's Degrees and that his terminal degree was in Management, his area of expertise. One of the curious aspects of faculty hiring and promotion at UDC, based on testimony from numerous witnesses, was the range of degrees (in terms of kind and area of specialization) found to be acceptable. Although a terminal degree is required for promotion to both Associate and Full Professor, UDC's definitions of terminal degrees is not limited to doctorates. Dean Crump, moreover, testified that the relative merit or value of doctoral degrees received scant attention in promotion decisions. Whether the degree came from a non-accredited program such as NOVA (the case with Dr. Farrall in 1984) or from a more prestigious institution did not matter: this seemed to be part of the "tallying" mentality.

**16.** The Collegewide Committee members for that year were: Dean Crump, Chair (black), Melanie Brown, Secretary (black), Richard Clark (black), Carlyle Hughes (white), Peter Martin (white), Earl Wortham (black), Patrick Hughes (black), and Kantilal Jain (Indian).

**17.** Claude A. Ford was then Acting President for UDC.

1981) (quoting *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir.1981)).[18] The Court finds that the plaintiff clearly established a prima facie case.

Once a plaintiff meets this burden, the defendant must then set forth "some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. Although the defendant does not bear the burden of establishing the nondiscriminatory reasons by a preponderance of the evidence, the defendant's evidence must be sufficient "to allow the trier of fact rationally to conclude that the employment decision ha[s] not been motivated by discriminatory animus." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 257, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). Here, defendant offers its selection process as a legitimate, nondiscriminatory method of promotion under which, in the year in question, another candidate was found more qualified. While under other circumstances the Court might rationally conclude that such a system guarded against decisions based on racial animus, it is unable to do so in light of the evidence presented by plaintiff in response to defendant's claims.

█ Despite the defendant's burden of production, the ultimate burden of persuasion remains on the plaintiff. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Plaintiff does not, however, have to provide direct evidence of discrimination to prevail. *See Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711 at 717, 103 S.Ct. 1478 at 1483, 75 L.Ed.2d 403. Plaintiff's ultimate burden may be met by either convincing the Court by a preponderance of the evidence that the refusal to promote "was motivated by a discriminatory reason" or by showing " 'that the employer's prof-

fered explanation is unworthy of credence.' " *Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 717–18, 103 S.Ct. 1478, 1483 (1983) (Blackmun, J., concurring) (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). Here, the Court believes that the defendant's explanation is unworthy of credence and is merely pretextual.

This decision, however, has not been an easy one. As the Supreme Court has recognized, decisions in discrimination cases are difficult and, in the end, the district court has to decide which party's explanation it believes. *See Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984) (quoting *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482). Although on its face the promotion process has the potential to be a nondiscriminatory, evenhanded comparison of prospective candidates, in practice it was hardly so. The sum total of the evidence given credence and the facts found by the Court—including, but not limited to, that the weight given the criteria changed annually; that quantity rather than quality determined a candidate's score; that a candidate's scholarly work was generally not studied, if even read, during the process; that the weight given was not decided until after the identity of the candidates was known; that the Dean in charge of the Collegewide Committee expressed personal opinions about the subjects and disfavored promoting plaintiff, had a preference for black women candidates, and manipulated the secret ballots so that he knew for whom members of the committee had voted—all lead the Court to conclude that defendant's explanation is merely a pretext for a decision based at least partially on racial bias.[19] Supporting this conclusion is

18. The Court finds that the facts in this case, similar to those in *Daye,* "support the suspicion that the defendant is that unusual employer who discriminates against [whites]" and are sufficient to establish that plaintiff is entitled to use the *McDonnell Douglas* criteria to establish a prima facie case. *See Parker v. B & O Railroad,* 652 F.2d 1012, 1017–18 (D.C.Cir.1981) (citing *Daye v. Harris* ). The Court finds it unnecessary to deal in detail with the legally analytical anomaly that on the UDC faculty, part of an

educational institution, and in the District of Columbia, a geographic and political entity, blacks constitute a "majority" and whites are a "minority."

19. In the face of such overwhelming evidence that defendant's "process" was manipulated, the Court is unwilling to find that such an arbitrary, unfair system insulates the defendant from Title VII.

the Court's belief that plaintiff was the more qualified candidate.[20] While not sufficient for liability on its own, this finding is probative of pretext. *See Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096–97.

Therefore, the Court finds that plaintiff was discriminated against on the basis of race in violation of § 703(a)(1) of Title VII.[21] *See* 42 U.S.C. § 2000e–2(a)(1). Accordingly, the Court orders the defendant to pay plaintiff backpay of $11,787.53 and to add $1,768.13 to plaintiff's retirement fund.[22]

---

**20.** The Court is mindful that it is not well-qualified to judge the relative merits of UDC's faculty members; the fact that those charged with that task failed to carry it out in a meaningful way is, however, obvious.

**21.** Plaintiff also argues that he was retaliated against in violation of § 704(a) of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e–3. The Court, however, finds that plaintiff has

failed to establish a prima facie case under this section for the promotion year involved here. Plaintiff's first grievance alleging race discrimination was not filed until December 20, 1985, after the promotion process for that year had been completed.

**22.** *See* Affidavit of Ms. W. Sue Reddick, at 3.