98 F.3d 1345
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Randy D. FREDERICK and Loren D. Roper, Plaintiffs-Appellants,
v.
CITY OF PORTLAND, Portland Development Commission,
Metropolitan Exposition-Recreation Commission,
Portland Trail Blazers Inc., and Oregon
Arena Corporation, Defendants-Appellees.
 No. 95-35389.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 18, 1996.
Decided Oct. 10, 1996.
 
 Before: ALDISERT*, PREGERSON, and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Plaintiffs-appellants Randy Frederick and Loren Roper appeal the district court's grant of summary judgment in favor of defendants-appellees Oregon Arena Corporation and Trailblazers, Inc.[1] Frederick and Roper allege reverse race discrimination by defendants under 42 U.S.C. § 2000e-2(a)(1) ("Title VII").
 
 
 3
 Plaintiffs raise the following four issues on appeal:
 
 
 4
 1. Did the district court err in striking, as inadmissible hearsay, portions of an affidavit?
 
 
 5
 2. Did the district court apply an improper standard to plaintiff's prima facie case of reverse race discrimination?
 
 
 6
 3. Did the district court err in requiring plaintiffs to establish the absence of pretext to withstand summary judgment?
 
 
 7
 4. Did the district court err in holding that no genuine issue of material fact existed?
 
 
 8
 We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 BACKGROUND
 
 9
 Plaintiffs were previously employed by the City of Portland's ("City") Exposition-Recreation Commission ("ERC"), which managed the Portland Memorial Coliseum ("Coliseum"). Plaintiffs, as "utility leads," were responsible for custodial and maintenance services in the Coliseum. When the Metropolitan Exposition-Recreation Commission ("MERC") succeeded ERC, taking over management of the Coliseum, all ERC employees, including plaintiffs, became MERC employees.
 
 
 10
 Following a separate agreement between the City and the Oregon Arena Corporation ("OAC"), OAC took over responsibility for managing the Coliseum, thus replacing MERC. OAC decided to conduct its own hiring rather than automatically hire all MERC employees.
 
 
 11
 As a result of the shift in management of the Coliseum, all MERC employees, including plaintiffs, were laid off. Although laid off, all MERC employees had an opportunity to interview for the OAC positions. The agreement required that OAC interview MERC employees, but it did not require that OAC hire MERC employees.
 
 
 12
 The agreement between the City and OAC included other hiring provisions. Plaintiffs find two provisions particularly troublesome. The first provision required that OAC use JobNet, a job placement and training network, as the first source for recruitment and referral of applicants for covered positions. Covered positions included all job openings created as a result of terminations or expansions of OAC's work force.
 
 
 13
 The second provision set hiring targets based on geography: 50% Portland residents and 30% residents from the North/Northeast Enterprise Zone, an area within the city of Portland. Plaintiffs allege that 70% of African Americans residing in Portland live in the North/Northeast Enterprise Zone. But, neither plaintiffs nor defendants provide statistics as to the racial composition of the North/Northeast geographical area.
 
 
 14
 OAC interviewed plaintiffs for the utility lead positions. Plaintiffs' records included both positive and negative evaluations. Evaluations of Frederick included comments such as "confident," "knowledgeable," "can do the job on his own," well prepared," "positive attitude," and "suggest we hire." But evaluations of Frederick also included comments such as "confrontational," "very negative about people," and "stubborn." Positive evaluations of Roper included comments such as "gets the job done," "good candidate," and "probable hire." But evaluations of Roper also included comments such as "slightly negative towards current management," and "needs to curb temper." Moreover, while working as a utility lead, Roper consistently received negative performance evaluations, was suspended without pay on four occasions, and his supervisor recommended OAC not hire him.
 
 
 15
 OAC ultimately hired a total of ten utility leads out of twenty-one "available candidates,"[2] including candidates from MERC, JobNet, and other sources. Five hires were former MERC employees and five were JobNet referrals. The MERC employees hired included one Latino and four Caucasians. The JobNet referrals hired included three African Americans and two Caucasians. Five MERC employees, all of whom were Caucasian, were not hired. All JobNet referrals were hired. None of the four candidates from other referral sources--two African Americans and two Caucasians, were hired. In sum, the eleven rejected candidates included nine Caucasians and two African Americans. Plaintiffs are among the nine Caucasians not hired by OAC.
 
 ANALYSIS
 
 16
 We review de novo a district court's grant of summary judgment. Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). Summary judgment should be granted only if no genuine issue of material fact exists. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), and cert. denied, 116 S.Ct. 1261 (1996). We may affirm on any ground supported by the record. Salmeron v. United States, 724 F.2d 1357, 1364 (9th Cir.1983).
 
 A. Hearsay Statements
 
 17
 Plaintiffs contend that the district court erred in finding that statements made in an affidavit by a former OAC employee, Rudolph Williams, constitute hearsay. Specifically, plaintiffs contend that the statements, because made by a corporate officer of a party-opponent, are not hearsay because they constitute an admission by the party-opponent.
 
 
 18
 Under Rule 801(d)(2), a statement is not hearsay if it is "offered against a party and ... is a statement by the party's agent or servant concerning a matter within the scope of agency or employment made during the existence of the relationship." Fed.R.Evid. 801(d)(2) (emphasis added). The proponent of the evidence is required to demonstrate that the former employee was acting as an agent. City of Long Beach v. Standard Oil Co. of Cal., 46 F.3d 929, 937 (9th Cir.1995). When ruling on a motion for summary judgment, the court should not consider hearsay statements. Rossi v. Trans World Airlines Inc., 507 F.2d 404, 406 (9th Cir.1974).
 
 
 19
 Here, plaintiffs fail to demonstrate that Williams made the statements as defendant's agent during the existence of the employment relationship. Williams, at the time he made the affidavit, was no longer an OAC employee. Plaintiffs offer no other basis to find either that Williams was acting as an agent or that a relationship between Williams and OAC continued. Plaintiffs therefore fail to sustain their burden of laying a proper evidentiary foundation. The district court properly excluded the bulk of these statements as hearsay.[3]
 
 B. The Prima Facie Case
 
 20
 Plaintiffs allege that the district court applied an improper standard to evaluate their prima facie case of reverse race discrimination. Under the traditional formulation of a prima facie case of race discrimination, a plaintiff must show that: (1) he or she belongs to a racial minority; (2) he or she applied for and was qualified for the job; (3) he or she was rejected for the position despite his or her qualifications; and (4) that this position remained open after his or her rejection and the employer continued to seek applications from other people with qualifications similar to the plaintiff. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). This traditional prima facie test is not applicable in every situation and is not the sole method of establishing a prima facie test of discrimination. McDonald v. Santa Fe Trail Trans. Co., 427 U.S. 273, 279 n. 6 (1976). Here, because plaintiffs do not belong to a racial minority, the district court applied a standard articulated by the D.C. Circuit for reverse race discrimination cases. This standard requires that in addition to the four traditional elements of a prima facie case, a plaintiff show "background circumstances which support the suspicion that the defendant is that unusual employer who discriminated against the majority." Parker v. Baltimore & Ohio R.R. Co., 652 F.2d 1012, 1017 (D.C.Cir.1981).
 
 
 21
 Currently, there is a circuit split concerning requirements for a prima facie case of reverse race discrimination. Instead of requiring a plaintiff to show that he or she is a member of a racial minority, some circuits merely require plaintiff to show that he or she "belongs to a class." See Wilson v. Bailey, 934 F.2d 301, 304 (11th Cir.1991). Apparently, under this formulation, anyone could satisfy the first step. On the other hand, the D.C. Circuit adjusts the first step to require that a member of a majority racial group show some additional "background circumstances" suggesting discrimination. Parker v. Baltimore & Ohio R.R. Co., 652 F.2d at 1017. The Ninth Circuit has not dealt with this issue. But we need not address it here because we affirm on alternative grounds as explained below.
 
 C. Establishing the Absence of Pretext[4]
 
 22
 Evaluating a Title VII disparate treatment claim requires a three-step analysis. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981). First, the plaintiff must present a prima facie case of discrimination, as discussed above. After the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for failing to hire the plaintiff. The burden then shifts back to the plaintiff to present evidence that the employer's legitimate reason is merely a pretext for discrimination. Id. The ultimate burden of persuasion rests upon the plaintiff at all times. Id. at 253.
 
 
 23
 This three-step analysis also applies to Title VII disparate treatment claims decided on summary judgment. Wallis v. J.R. Simplot Co., 26 F.3d 885 (9th Cir.1994). Summary judgment is not appropriate if a rational trier of fact could determine that the employer's actions were taken for discriminatory reasons. Id. at 889. To avoid summary judgment, the plaintiff must raise a genuine issue of material fact regarding whether the employer's stated reason is merely a pretext for discrimination. Id. at 890. The plaintiff must produce "specific, substantial evidence of pretext." Id. (quoting Steckl v. Motorola Inc., 703 F.2d 392, 393 (9th Cir.1983)).
 
 
 24
 Here, assuming plaintiffs presented a prima facie case of discrimination, the burden of production shifted to OAC to demonstrate legitimate, nondiscriminatory reasons for refusing to hire plaintiffs. Defendants presented evidence that plaintiffs' work performances were lacking. Frederick's evaluations included "confrontational," "very negative about people," and "stubborn." Roper's performance evaluations included "slightly negative toward management," and "needs to curb temper." Roper's evaluations were consistently negative, his employment records show that he was suspended without pay, and his supervisor recommended that OAC not hire him. Thus, OAC met its burden of producing legitimate nondiscriminatory reasons for not hiring Frederick and Roper.
 
 
 25
 Because OAC presented legitimate nondiscriminatory reasons for its actions, plaintiffs were required to present admissible evidence that defendant's reasons were pretextual. Wallis, 26 F.3d 885 at 890. Plaintiffs make three related arguments regarding their evidence of pretext. First, they argue that the geographic hiring target in the agreement between the City and OAC constituted a quota. Second, they argue that the quota was based on race. Third, plaintiffs argue that OAC could not fill this racial quota without considering plaintiffs' race. Therefore, according to plaintiffs, race was a motivating factor in OAC's decision not to hire Frederick and Roper.
 
 
 26
 Plaintiffs' first argument, that quotas regulated the hiring process, lacks support. As evidence, plaintiffs point to the agreement between the City and OAC containing a geographic hiring target of 30% from North/Northeast Portland and 50% from Portland. Plaintiffs then argue that the "stunningly precise fulfillment of the 'target' ... [is] more than merely coincidental." Plaintiffs, however, present no evidence of the fulfillment of the hiring target. Plaintiffs do not provide evidence concerning where any of the candidates, whether hired or not, resided. Thus, it is impossible to determine whether this target was reached and, if the target was reached, whether indeed it was "more than merely coincidental."
 
 
 27
 Plaintiffs' second argument is that the 'quotas' are based on race. Plaintiffs make two attempts to link the hiring "quotas" to race. The first is by asking the court to infer that geography is being used as a proxy for race. The second is to ask the court to infer that the referral service, JobNet, is being used as a proxy for race. Plaintiffs fail to provide any support for either inference.
 
 
 28
 To support their claim that geography is used as a proxy for race, plaintiffs provide evidence that a majority of African American residents of Portland live in North/Northeast Portland. Plaintiffs, however, provide no evidence regarding the racial composition of that area. Specifically, plaintiffs failed to present any evidence regarding what percentage of North/Northeast residents were African American. Failing to provide this information precludes any inference that geography serves as a proxy for race.
 
 
 29
 Plaintiffs' second attempt to bolster their argument that a racial quota existed is by asking the court to infer that JobNet is a referral service for minority candidates. To support this claim, plaintiffs use Williams's statement in his affidavit that he "thought of JobNet as the referral source for underemployed racial minorities." (Appellants' Excerpts of Record, vol. 2, p. 225.) Williams's statement of opinion, however, is belied by plaintiffs' own evidence that two of the five JobNet candidates hired were Caucasian. Williams also stated that "the statistical percentages of employment of candidates from the target zone would be met at all costs, i.e. these percentages were not merely 'aspirational goals,' but rather absolute quotas for the hiring of minorities...." Although this statement posits the existence of racial quotas, it assumes their existence without providing supporting evidence. Without any evidence of either the existence of quotas or the racial basis of quotas, plaintiffs have failed to demonstrate the existence of racial quotas.
 
 
 30
 Plaintiff's third argument, that to fulfill this "racial quota," OAC considered plaintiffs' race when deciding whether to hire plaintiffs, also assumes the existence of a racial quota. Assuming arguendo that a racial quota existed, plaintiffs provide no evidence that their race was considered in OAC's hiring decisions. As the district court noted, plaintiffs presented no evidence that minority candidates with interview evaluations similar to plaintiffs were hired or that any Caucasian employee with excellent evaluations was not hired. Plaintiffs provide no information about the evaluation of African American candidates who were hired or about the evaluation of African American candidates who were not hired. Plaintiffs do provide evidence that some interviewers took note of the "minority" or "affirmative action" status of candidates they interviewed. This statement, however, is insufficient to demonstrate that the decisions not to hire Frederick or Roper were made because of their race. Plaintiffs also quote Williams's affidavit in which he states that the "tenor of the times" made the hiring of minorities a necessity. (Appellants Excerpt of Record vol. 2, p. 227). This statement is also insufficient to demonstrate that the decision to not hire plaintiffs was made because of their race.
 
 
 31
 Plaintiffs argue that the Civil Rights Act of 1991 ("the Act") altered the allocation of the burden of proof in Title VII cases. According to plaintiffs' analysis, under the Act an employer has the burden of proving that no impermissible factor motivated its actions.
 
 
 32
 Plaintiffs' argument is without merit. The Act's provision becomes relevant only after plaintiff proves that an employer's actions were motivated, at least in part, by impermissible factors. See 42 U.S.C. §§ 2000e-2(m) and 2000e-5(g).
 
 
 33
 Plaintiffs correctly point out that a plaintiff is not required to prove pretext on summary judgment, but merely to raise a genuine issue of material fact with respect to pretext. Wallis v. J.R. Simplot, 26 F.3d 885 at 890. Mere allegations and unsupported inferences, however, do not constitute specific, substantial evidence of pretext and are not sufficient to raise a genuine issue of material fact to withstand summary judgment.
 
 
 34
 For the foregoing reasons, we AFFIRM.
 
 
 
 *
 Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Plaintiffs appeal the district court's decision as to defendants the Oregon Arena Corporation and Trailblazers, Inc., but not as to the City of Portland, Portland Development Commission or Metropolitan Exposition-Recreation Commission
 
 
 [2]
 Plaintiffs define an available candidate as a candidate who progressed to the second round of interviews and did not withdraw or retire. Plaintiffs do not describe the qualifications or interview evaluations of any of the available candidates other than themselves
 
 
 [3]
 It was error to strike the sentence in the affidavit relating to a statement made by Glickman. That sentence constituted an admission of a party opponent and thus was not hearsay. But, because that statement was already in the record, the error was harmless
 
 
 [4]
 Issues three and four are discussed together because, by failing to show any evidence of pretext, plaintiffs necessarily failed to raise a genuine issue of material fact